STATE of Wisconsin, Plaintiff-Respondent,

v.

William F. SCHWEDA, Jeffrey G. Schweda,
and ECI Special Waste Services, Inc.,
Defendants-Appellants.

Supreme Court

*No. 2005AP1507. Oral argument February 14, 2007.
—Decided July 13, 2007.*

2007 WI 100

(Also reported in 736 N.W.2d 49.)

354

For the defendants-appellants there were briefs by *John E. Machulak, Susan R. Robertson,* and *Machulak, Robertson & Sodos, S.C.,* Milwaukee and oral argument by *John E. Machulak.*

For the plaintiff-respondent the cause was argued by *Joanne F. Kloppenburg,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. ANN WALSH BRADLEY, J. This case is before the court on certification from the court of appeals pursuant to Wis. Stat. (Rule) § 809.61 (2005–06).[1] The defendants, William F. Schweda, Jeffrey G. Schweda, and ECI Special Waste Services, Inc. (collectively, ECI)

---

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

appeal an order and a judgment of the circuit court for Fond du Lac County, Judge Peter L. Grimm presiding. The order granted the State's motion to strike ECI's demand for a jury trial. The circuit court concluded that the constitutional right to a jury trial does not attach to an action seeking forfeitures for violations of waste disposal regulations.[2] After a trial to the court, the circuit court entered a judgment in favor of the State.

¶ 2. ECI maintains that the circuit court erred in striking its demand for a jury trial. It contends that the causes of action asserted by the State are analogous to common law nuisance claims. It further contends that because common law nuisance claims existed in 1848, and because such claims were actions at law in 1848, the State's claims fulfill the criteria for a constitutional right to a jury trial under *Village Food & Liquor Mart v. H & S Petroleum,* 2002 WI 92, 254 Wis. 2d 478, 647 N.W.2d 177.

¶ 3. Applying the *Village Food* test, we determine that the claims asserted in the State's complaint do not give rise to a constitutional right to a jury trial. Common law nuisance causes of action are not sufficiently analogous to be considered "essential counterparts" to the modern day regulatory claims asserted here. Therefore, ECI fails the first prong of the *Village Food* test because the claims asserted did not exist, were not

---

[2] The court of appeals certified the case to this court with the following question. "Under the test set forth in *Village Food & Liquor Mart v. H & S Petroleum, Inc.,* 2002 WI 92, 254 Wis. 2d 478, 647 N.W.2d 177, does the constitutional right to a jury trial attach in an action for violations of waste disposal regulations where common-law nuisance theory provides the foundation for modern environmental law, but forfeiture actions for improper treatment of wastewater and hazardous waste did not exist in 1848?"

known, and were not recognized at common law at the time the state's constitution was adopted. *Id.,* ¶ 16.

¶ 4. Our determination, however, does not preclude the constitutional right to a jury trial in all environmental regulatory cases. Such a right exists if the asserted claim has an essential counterpart that existed at common law in 1848 and was recognized as an action at law in 1848. *Id.*

I

¶ 5. William and Jeffrey Schweda are owners of ECI Special Waste Services, Inc., a "centralized waste treater" pursuant to Wis. Admin. Code § NR 211.03(2e)(Oct., 2002). ECI collects waste from client industries, transports the waste to its treatment facility, and pre-treats the waste to comply with specific discharge limitations which are governed by a pretreatment permit issued by the City of Fond du Lac ("City"). ECI then discharges the waste into a sanitary sewer that goes into the City's municipal wastewater treatment plant. ECI's permit requires compliance with effluent limitations, monitoring requirements, and other conditions which are set forth in the permit. ECI also must comply with Wis. Admin. Code ch. 211, which governs centralized waste treaters.

¶ 6. William Schweda began working at ECI as a salesman in 1999 and part of his compensation was shares of stock in the company. In July 2001 William's brother, Jeffrey Schweda, purchased the remaining shares of stock from the founder for $225,000. This purchase made the Schweda brothers the owners of ECI.

¶ 7. In January 2002 the City's wastewater treatment plant experienced an upset condition that caused the City to exceed its discharge limits under its permit

357

for oxygen-consuming organic waste and total suspended solids.[3] In March and April of 2002, the City again experienced an upset and consequent permit violation. The City was able to determine that the upsets of the treatment facility were due to high concentrations of surfactants in the wastewater.

¶ 8. The City began sampling the discharges coming from ECI's treatment facility and the samples revealed that ECI persistently exceeded the discharge limits in its permit. During the year in which they operated ECI, the Schwedas used almost no chemicals, disposed of almost no sludge, tested only for pH, did not use the one machine in their laboratory that determined how to treat metals in the wastes they accepted, and did not send any waste samples out for independent laboratory testing. In August 2002, the City revoked ECI's permit to operate as a wastewater treatment facility and the Schwedas closed the facility.

¶ 9. The State brought suit against the Schwedas, alleging that ECI failed to comply with the conditions of their permit and with requirements under the state administrative code and state statutes during the time that the Schwedas owned ECI. The complaint asserted fifteen claims for relief arising out of ECI's operations. The State sought forfeitures for ECI's violations under Wis. Stat. §§ 281.98(1), 283.91(2), 289.96(3)(a), and 291.97(1), penalties pursuant to Wis. Stat. § 757.05(1)(a), and the environmental assessment available under Wis. Stat. § 299.93.

¶ 10. ECI demanded a jury trial, and the State moved to strike. The circuit court granted the State's motion, determining that ECI failed to demonstrate

---

[3] *See* Wis. Admin. Code § NR 205.03(41) (May, 2001).

that the State's action met either of the two prongs of the test for a constitutional right to a jury trial set forth in *Village Food*.

¶ 11. The case was tried to the court. The circuit court determined that ECI was liable for some, but not all, of the violations alleged, and imposed forfeitures for the time period the Schwedas owned and managed ECI. ECI appealed, and the court of appeals certified the case on the question of a right to jury trial under Article I, Section 5 of the Wisconsin Constitution.

## II

¶ 12. This case addresses the issue of whether a cause of action gives rise to a right to a jury trial under Article I, Section 5 of the Wisconsin Constitution. Whether there is a constitutionally guaranteed right to a jury trial for a particular cause of action requires us to interpret a provision of the state constitution, which we do independently of the determination rendered by the circuit court. *Vill. Food,* 254 Wis. 2d 478, ¶ 7.

## III

¶ 13. ECI maintains that the circuit court erred in striking its demand for a jury trial. It contends that the causes of action asserted by the State are analogous to common law nuisance claims. It further argues that because common law nuisance claims existed at common law in 1848, and because such claims were actions at law in 1848, the State's claims fulfill the criteria for a constitutional right to a jury trial under *Village Food*.

¶ 14. We disagree. Applying the *Village Food* test, we determine that the claims asserted in the State's complaint do not give rise to a constitutional right to a

359

jury trial. Common law nuisance causes of action are not sufficiently analogous to be considered "essential counterparts" to the modern day regulatory claims asserted here. Therefore, ECI fails the first prong of the *Village Food* test because the claims asserted did not exist, were not known, and were not recognized at the time the state's constitution was adopted.

¶ 15.   Our conclusion is consistent with the determinations of other states which have addressed a similar issue.[4] Like other states, we begin our examination by reviewing our state constitution.

¶ 16.   Under Article I, Section 5 of the Wisconsin Constitution, the right to a jury trial "shall remain inviolate." Section 5 provides in full:

---

[4] In *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440 (Tex. 1993), the Texas Supreme Court determined that the state's constitution provided the right to a jury trial for only those types of cases tried to a jury at the time of its adoption in 1876. The court determined that in 1876 there were no regulatory schemes comparable to those constituted by the state's environmental statutes and regulations. Thus, it concluded that the state's assessments of penalties for violations of the modern environmental regulations were not analogous to any type of action tried in 1876, and that those assessments did not give rise to a constitutional right to a jury trial. *Id.* at 451.

The Pennsylvania Commonwealth Court examined whether the defendants had a constitutional right to a jury trial for an environmental enforcement action in *Commonwealth, Dep't of Envtl. Res. v. Wheeling-Pittsburgh Steel Corp.*, 348 A.2d 765 (Pa. Commw. Ct. 1975). The court examined Article 1, Section 6 of the Pennsylvania Constitution which states:   "Trial by jury shall be as heretofore, and the right thereof remain inviolate." The court commented that this language exists exclusively for the purpose of preserving jury trials as provided by common law. Ultimately the court concluded that "the constitutional right to a jury trial does not extend to respondent in these proceedings, which are wholly a creature of recent statutory law." *Id.* at 768.

The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law. Provided, however, that the legislature may, from time to time, by statute provide that a valid verdict, in civil cases, may be based on the votes of a specified number of the jury, not less than five-sixths thereof.

¶ 17.    While Article I, Section 5 provides that the right "shall remain inviolate," it does not apply to all matters. Historically, it has been interpreted to apply only to civil cases. *Dane County v. McGrew,* 2005 WI 130, ¶ 13, 285 Wis. 2d 519, 699 N.W.2d 890; *Bennett v. State,* 57 Wis. 69, 74, 14 N.W. 912 (1883). Jury trial in criminal cases falls under the purview of Article I, Section 7.

Likewise, the Connecticut Supreme Court examined its state constitutional provision when addressing the issue of whether there was a constitutional right to a jury trial for the enforcement of environmental regulations in *Comm'r of Envtl. Prot. v. Connecticut Bldg. Wrecking Co., Inc.,* 629 A.2d 1116 (Conn. 1993). The Connecticut Constitution "guarantees a jury trial in all cases for which 'there was a right to a trial by jury at the time of the adoption of that provision,' which was 1818." *Id.* at 1121 (quoting Conn. Const. Art. I., Sec. 19 (2007)) (brackets omitted). The petitioner did not claim that environmental enforcement actions existed at common law in 1818, but rather that such actions were substantially similar to actions in debt, which existed at common law in 1818 and could be tried to a jury. The Connecticut court rejected the argument and concluded that, consistent with Connecticut's common law history, there was no constitutional right to a jury trial. *Id.* at 1122. *See also Lloyd A. Fry Roofing Co. v. Pollution Control Bd.,* 314 N.E.2d 350, 357–58 (Ill. App. Ct. 1974) (holding that defendant "cannot argue" that right to trial by jury had been abridged in the context of administrative proceedings for violations of state environmental protection statute which were unknown at common law.)

¶ 18. Moreover, Section 5 has been interpreted to mean that the right is preserved to the extent that it existed at the time of the adoption of the state constitution in 1848. *See McGrew,* 285 Wis. 2d 519, ¶ 15; *Town of Burke v. City of Madison,* 17 Wis. 2d 623, 635, 117 N.W.2d 580 (1962). Three cases comprise this state's recent jurisprudence on the question of when the right to a jury trial as it existed in 1848 creates a constitutional right to a jury trial in a contemporary cause of action, *State v. Ameritech Corp.,* 185 Wis. 2d 686, 517 N.W.2d 705 (Ct. App. 1994), *Village Food,* and *McGrew.*

¶ 19. In *Ameritech,* the court of appeals adopted a two-prong test for determining whether a statutory cause of action gives rise to a constitutional right to a jury trial. It determined that there is such a right where "(1) the statute codifies an action known to the common law in 1848; *and* (2) the action was regarded as at law [i.e., rather than at equity] in 1848." 185 Wis. 2d at 690 (emphasis in original).

¶ 20. This court examined the *Ameritech* decision in *Village Food.* 254 Wis. 2d 478, ¶ 9. We refined the first prong of the *Ameritech* test so that an action need not be based on the codification of a specific common law action that existed in 1848. Rather, the action must have existed, been known, or been recognized at common law in 1848. We stated the test as follows:

> [A] party has a constitutional right to have a statutory claim tried to a jury when: (1) the cause of action created by the statute existed, was known, or recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848; and (2) the action was regarded as at law in 1848.

*Vill. Food,* 254 Wis. 2d 478, ¶ 16.

¶ 21. This court has been unanimous in concluding that the *Village Food* test is the correct test to apply in determining whether a cause of action gives rise to a constitutional right to a jury trial. The application of the test to particular causes of action has not occasioned similar consensus. The *Village Food* and *McGrew* decisions were both divided on the question of application. Regardless of those divisions, however, the court has been univocal in rejecting the temptation to carve out a constitutional right to a jury trial based on broad analogies between modern causes of action and causes of action at statehood.

¶ 22. *Village Food* involved allegations that the defendant violated Wis. Stat. §§ 100.30(2)(am)1m.c and 100.30(3) (1999–2000), which require minimum mark-ups for the sale of motor vehicle fuel. In applying the two-part test, the *Village Food* majority explicitly rejected the defendant's attempt to analogize the cause of action to that in *Getty v. Rountree,* 2 Pin. 379 (Wis. 1850), which involved fraud and breach of implied warranty. Although the two cases were similar insofar as both involved business torts in which one party alleged harm, such broad-brush similarity was insufficient for the court to conclude that the cause of action for violating minimum mark-up laws existed, was known, or was recognized at common law. *Vill. Food,* 254 Wis. 2d 478, ¶ 25.

¶ 23. Instead, the court determined that the mark-up laws are "of the same 'nature' " as the common law crimes of forestalling the market, regrating, and engrossing. *Id.,* ¶ 27 (citing, inter alia, 4 William Blackstone, *Commentaries on the Laws of England,* ch. 12, at 158–59 (1778)). Thus, the *Village Food* majority rejected drawing an analogy between a modern statutory cause of action and a common law cause of action based

on exceedingly general descriptions. Rather, it employed a narrower description of the actions to determine whether they were analogous. Because the claims at issue were "essentially counterparts" to the common law offenses, the majority determined that the claims gave rise to a constitutional right to a jury trial. *Vill. Food,* 254 Wis. 2d 478, ¶ 28 (citing *Ameritech,* 185 Wis. 2d at 697).

¶ 24.    The concurrence/dissent in *Village Food* agreed with the majority regarding the test for determining whether there is a right to a jury trial, but disagreed regarding whether violations of Wis. Stat. § 100.30 met the test. *Id.,* ¶ 35 (Wilcox, J., concurring in part and dissenting in part). It viewed the Unfair Sales Act as a "detailed scheme for the regulation of commercial pricing practices . . . ." *Id.,* ¶ 45, and concluded that the claims alleged did not exist, were not known, and were not recognized at common law. *Id.,* ¶ 47.

¶ 25.    Further the concurrence/dissent warned that such a broad classification would render the *Village Food* test a nullity because "present causes of action of all sorts assessed under this test will only have to be compared generally . . . in order to invoke the constitutional protection to a trial by jury." *Id.,* ¶ 46. Thus, the *Village Food* majority and concurrence/dissent agreed on the appropriate test, and agreed that the constitutional right to a jury trial cannot be based on a very broad analogy to a cause of action at statehood. They disagreed only on the matter of how narrow the analogy may be.

¶ 26.    In *McGrew,* this court split on the question of whether there is a constitutional right to a jury trial in a cause of action for speeding pursuant to Wis. Stat. § 346.57(4)(h) (2001–02). In the lead opinion, three justices rejected the view that speeding was analogous to the common law nuisance offenses of "annoyances in

highways, bridges, and public rivers, by rendering the same inconvenient or dangerous to pass . . . ." 285 Wis. 2d 519, ¶ 24 (quoting 4 Blackstone, *supra,* at 167).

¶ 27.  The lead opinion stated that "the class of actions categorized as 'nuisances' [is] simply too broad to be analogized to a speeding violation. . . . [T]hey are not 'essentially counterparts.' " *Id.,* ¶ 25. It warned that analyzing causes of action in terms so broad "would lead to a jury trial in virtually every forfeiture case." *Id.,* ¶ 28.

¶ 28.  The concurrence and dissent in *McGrew,* totaling four justices, concluded that the defendant did have a constitutional right to a jury trial.[5] However, the conclusion was not premised on drawing an analogy between speeding and the very broad category of nuisances for "annoyances in highways, bridges, and public rivers by rendering the same inconvenient or dangerous to pass . . . ." Rather, it was based on the narrower analogy between speeding and the rules of the road set forth in Wisconsin's statutes of 1849. *Id.,* ¶ 59 (Bradley, J., concurring) (citing Wis. Stat. ch. 33 (1849)); *see also id.,* ¶ 74 (Butler, J., dissenting). Similar to *Village Food,* the court agreed on the test for whether a cause of action gives rise to a right to a jury trial, and it agreed that such a right cannot be based upon a very broad analogy between the claim at issue and a cause of action at statehood. The court's disagreement concerned precisely how narrowly to draw the analogy in the first prong of the *Village Food* test.

---

[5] The concurrence and dissent differed as to whether the defendant had a constitutional right to a jury of six or a jury of twelve. *Dane County v. McGrew,* 2005 WI 130, ¶ 70 n.1, 285 Wis. 2d 519, 699 N.W.2d 890 (Bradley, J., concurring).

¶ 29.   Turning to the present case, we must determine whether ECI has a constitutional right to a jury trial for the causes of action in the State's complaint under the *Village Food* test. As noted, the first prong of the test is whether the cause of action "existed, was known, or recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848." *Vill. Food,* 254 Wis. 2d 478, ¶ 16. In applying the first part of the test, we are again confronted with the question of how narrowly to draw the analogy between the claims at issue and causes of action at statehood.

¶ 30.   ECI raises only one argument for why the causes of action in the State's complaint meet the first part of the *Village Food* test. It maintains that it has a right to a jury trial for the claims in the State's complaint because those claims are "essentially a counterpart to common law nuisance." The State's claims are based upon statutes and regulations that are "environmental" in nature. At statehood, environmental protection was achieved by common law actions in public and private nuisance. ECI therefore contends that the environmental nature of the State's claims and the environmental aspect of common law nuisance warrant the conclusion that the State's claims "existed, [were] known, or recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848." *Vill. Food,* 254 Wis. 2d 478, ¶ 16.[6]

---

[6] ECI bases its claims on both public and private nuisance. Private nuisance has historically been defined as an "interference with the use and enjoyment of land." W. Page Keeton, *Prosser and Keeton on the Law of Torts,* § 87 at 619 (5th ed. 1984). It includes, for example, erecting buildings so near to a person's house that it obstructs the light, keeping noisy animals so near another's house "that the stench of them incommodes

¶ 31. There is no question that modern environmental law finds its roots in common law nuisance. A leading treatise on environmental law states:

> The deepest doctrinal roots of modern environmental law are found in principles of nuisance. . . . Nuisance actions have involved pollution of all physical media—air, water, land—by a wide variety of means. . . . Nuisance actions have challenged virtually every major industrial and municipal activity which is today the subject of comprehensive environmental regulation . . . . Nuisance theory and case law is the common law backbone of modern environmental and energy law.

William H. Rodgers, Jr., *Handbook on Environmental Law*, § 2.1, at 100 (1977).

¶ 32. However, there are vital differences between nuisance law and modern environmental regulatory law. For one, nuisance is a sprawling concept. Historically, "nuisance" has been a term so broad that it could encompass a vast array of causes of action. It included everything from an alarming advertisement to a cockroach baked in a pie.

> There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word "nuisance." It has meant all things to all people, and has

him and makes the air unwholesome." 3 William Blackstone, *Commentaries on the Laws of England,* ch. 13 at 217–18 (1765–69). While these could be broadly understood as "environmental," private nuisances involve injuries to private property. In contrast, public nuisance involves more generalized harms. *See Attorney-Gen. v. The Sheffield Gas Consumers' Co.,* 43 Eng. Rep. 119, 125 (1853); George V. Yool, *An Essay on Waste, Nuisance, and Trespass,* 85 (1863).

Here, there are no allegations of harms to private property. Therefore the appropriate focus of our analysis is on whether the claims are analogous to public nuisance.

been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition. Few terms have afforded so excellent an illustration of the familiar tendency of the courts to seize upon a catchword as a substitute for any analysis of a problem . . . .

W. Page Keeton, *Prosser and Keeton on the Law of Torts,* § 86, at 616–17 (5th ed. 1984).

¶ 33.　Such vagueness is demonstrated by the mélange of causes of action characterized as public nuisances. Prosser and Keeton further detail such offenses as eavesdropping on a jury and being a common scold as constituting public nuisance. *Id.,* § 90, at 643–44.

¶ 34.　This court has demonstrated its wariness of basing a constitutional right to a jury trial on such a broad analogy. *See McGrew,* 285 Wis. 2d 519, ¶¶ 25, 28; *Vill. Food,* 254 Wis. 2d 478, ¶¶ 23–25. We are therefore cautious here as well. Having "doctrinal roots" in nuisance is not alone sufficient for a modern cause of action to be "essentially a counterpart" to nuisance actions. We note that a modern statutory claim may codify a common law nuisance action that existed, was known, or recognized in 1848 and thereby meet the first prong of the *Village Food* test. However, the modern cause of action requires more than a passing resemblance to the action. As we put it in *Village Food,* it must be "essentially [a] counterpart." *Id.,* ¶ 28.

¶ 35.　Here, the causes of action are not essentially counterparts to the public nuisance actions that existed at common law. A cause of action for public nuisance requires a showing of substantial and unreasonable harm to interests in the use and enjoyment of land. *See*

368

Keeton, *supra,* at 580. Under historic common law nuisance, a party should not seek recovery "until an actual nuisance has been committed, or at all events until it is quite clear that the [conduct] will inevitably result in a nuisance." George V. Yool, *An Essay on Waste, Nuisance, and Trespass,* 95 (1863). Modern environmental regulatory laws, however, "regulate more subtle and attenuated harms than the common law of nuisance does; a land use that creates a common law nuisance is thus likely to be an *a fortiori* violation of statutory environmental law." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs,* 101 F.3d 503, 505 (7th Cir. 1996).

¶ 36. Thus, while a complaint must allege harm in order to state a claim for nuisance, the claims alleged in the State's complaint do not depend upon allegations of harm in order to lie. Rather, the defendants are liable for violations regardless of harm.[7]

¶ 37. Claim 3, for example, alleges violations of Wis. Admin. Code § NR 211.16(1)(c)(Oct., 2002), which requires that a centralized waste treater submit a report to the municipality identifying the types of waste it intends to treat at least 180 days before commencing discharge. It also alleges violations of Wis. Admin. Code § NR 211.16(2), which requires the treater to notify the

---

[7] The concurrence/dissent states that the proper course is to "determine whether the claim alleges some harm that . . . is direct and immediate, and not merely speculative or remote." Concurrence/dissent, ¶ 114. The appropriate question, however, is not whether the complaint happens to allege some harm. Rather, the appropriate question is whether the cause of action is contingent upon allegations of harm. Whether a defendant has a right to a jury trial should not depend upon whether the plaintiff alleges harms that are not necessary for the cause of action to lie.

municipality at least 60 days before accepting a new type of categorical waste not identified in its initial report. Such violations do not require that any actual harm result from the failure to identify the types of waste or notify the municipality of the acceptance of new types of categorical waste.

¶ 38.   Claims 1, 4, 5, and 7–14 exhibit the same pattern:

- Claim 1 alleges that ECI "cause[d] or significantly contribute[d] to" the City of Fond du Lac exceeding its discharge permit limits for oxygen-consuming organic waste and total suspended solids in violation of Wis. Admin. Code § NR 211.10(1) (Oct., 2002).

- Claim 4 alleges violations of the limits on concentrations of pollutants in discharges incorporated into ECI's pretreatment permit pursuant to Wis. Admin. Code § NR 261.22(2) (Sept., 1997).

- Claim 5 alleges that ECI failed to notify the City of substantial changes in the character of ECI's discharges, thereby violating Wis. Admin. Code § NR 211.15(6) (Oct., 2002).

- Claim 7 alleges that ECI operated its facility "in ways inconsistent with the approved plans," in violation of Wis. Stat. § 281.98.

- Claim 8 alleges that ECI neglected its obligations as a centralized waste treater under Wis. Admin. Code § NR 211.16(3) (Oct., 2002) and "improperly accepted wastes they were incapable of properly treating, and wastes reasonably expected to cause exceedances of the City's effluent limits."

- Claim 9 alleges that the defendants failed to take representative samples of their effluent to assess compliance with their permit limits in violation of Wis. Admin. Code § NR 211.16(4).

- Claim 10 alleges that ECI violated Wis. Admin. Code § NR 211.16(5) (Oct., 2002), which requires centralized waste treaters to submit to the City semi-annual reports containing information about wastewater treated and discharged into the City's treatment system. It alleges that ECI's reports from the second half of 2001 and the first half of 2002 were incomplete because the reports omitted required information, including "the name and address of each waste's generator, the volume and date of arrival of each wastewater; and the applicable pretreatment standards."

- Claim 11 alleges that the defendants "failed to characterize the waste generated by treatment of the waste . . . in violation of Wis. Stat. § 291.21."

- Claim 12 alleges that ECI disposed of hazardous waste at a landfill not licensed to accept such waste, contrary to the requirements under Wis. Stat. § 291.21(9).

- Claim 13 alleges that that the defendants violated the prohibition on operating a hazardous waste facility without an operating license pursuant to Wis. Stat. § 291.25(2)(b) by storing hazardous waste.

- Claim 14 alleges that the defendants failed to properly label containers used for storage of hazardous waste. The State alleges that this violated Wis. Stat. § 291.21(3) and Wis. Admin. Code § NR 615.05(4)(a)5 (May, 1998).

■

¶ 39. None of the alleged violations is premised upon a showing of harm. Rather, they are regulatory violations for which the defendants are liable regardless of whether harm results. This is an important difference with nuisance. Harm is essential to nuisance, and no cause of action for nuisance may lie absent some allegation of harm. With respect to the claims here, no

harm is necessary, and none need be alleged. The kinship between nuisance and these claims is therefore but a distant relationship. Thus, they cannot be considered "essentially counterparts."[8]

[8] The concurrence/dissent cites to a number of cases to support its contention that some of the State's claims are analogous to common law public nuisance actions. Each of the cases misses the mark. The salient feature of the cases is that an allegation of harm is necessary for a cause of action to lie. *People v. Corp. of Albany,* 11 Wend. 539 (N.Y. 1834) involved pollution causing a basin in the Hudson River "to be foul, filled and choked up . . . whereby the citizens were not only deprived of the benefit and advantage of using the water . . . but the mud . . . became offensive and nauseous, corrupting the water, and causing noisome and unwholesome smells, infecting the air to the damage and common nuisance of the citizens." *Id.;* concurrence/dissent, ¶¶ 116–117. *Luning v. State,* 2 Pin. 215 (Wis. 1849), involved causing a water overflow that "created unpleasant and unwholesome vapors and sickness to the inhabitants . . . ." *Id.* at 218; concurrence/dissent, ¶ 119. Thus, in both cases people were actually deprived of an unpolluted environment and forced to experience infected air or water.

Similarly, in *State v. Buckman,* 8 N.H. 203 (1836), the defendants threw an animal carcass into a well, infecting a family's water with "noisome particles and effluvia" and causing the family to partake of "poisonous and unwholesome water." *Id.* at 205; concurrence/dissent, ¶ 127. The salient allegation in *Buckman* is not that the animal carcass was "inappropriately handled and disposed of at an inappropriate site," as the dissent posits. Rather, it is that the inappropriate handling and disposal of the animal carcass *caused harm.* Here, harm is not necessary for any of the causes of action to lie.

Finally, *Kilvington v. The City of Superior,* 83 Wis. 222, 225–26, 53 N.W. 487 (1892), discusses the authority of the government to exercise its power "by ordinance, resolution, law, or vote" to "prevent or abate nuisances" by removing "garbage, manure, or dead animals" from the village and contracting for their cremation. The existence of such a power, however, does

¶ 40.   The breadth of nuisance is so great that we must narrowly construe the actions that we analogize to nuisance, lest we render the *Village Food* test a nullity because "present causes of action of all sorts assessed under this test will only have to be compared generally . . . in order to invoke the constitutional protection to a trial by jury." *Vill. Food,* 254 Wis. 2d 478, ¶ 46 (Wilcox, J., concurring and dissenting). Similar to the lead opinion in *McGrew,* we determine that "the class of actions categorized as 'nuisances' [is] simply too broad to be analogized to" the present cause of action. *McGrew,* 285 Wis. 2d 519, ¶ 25.

¶ 41.   ECI has proffered no other cause of action at statehood as an essential counterpart to the causes of action here. Similarly, the State maintains that there were no other causes of action at statehood that are essential counterparts to the regulatory violations at issue here. Finally, in our own research we have found no causes of action at statehood sufficiently analogous to conclude that the State's regulatory claims existed, were known, or were recognized at common law in 1848.[9]

---

not render ordinances analogous to common law nuisance. Further, the concurrence/dissent does not provide an argument that violations of such ordinances were subject to jury trial in 1848. *See* concurrence/dissent, ¶ 108 n.23.

[9] The concurrence/dissent's discussion of *Tull v. United States,* 481 U.S. 412 (1987), is inapt. Concurrence/dissent, ¶ 114 n.28. The Court explicitly rejected the idea that the appropriate way to determine whether the Seventh Amendment provides for the right to a jury trial was to find a close analogue to the modern cause of action at issue:

> [W]e need not decide the question. As *Pernell v. Southall Realty,* 416 U.S. [363], at 375 [(1974)], cautioned, the fact that the subject matter of a modern statutory action and an 18th-century English action are close equivalents "is irrelevant for Seventh Amendment purposes," because "that Amendment requires trial by jury in actions unheard of at common law."

¶ 42. Thus, where such a vital aspect of a common law nuisance cause of action, i.e., harm, is not part of a contemporary cause of action, it is our determination that the two are not sufficiently analogous to pass the first prong of the *Village Food* test. Rather, the causes of action here are part of a "detailed scheme [of] regulation" of the sort the *Village Food* concurrence/dissent discerned in the Unfair Sales Act. *Vill. Food,* 254 Wis. 2d 478, ¶ 45 (Wilcox, J., concurring and dissenting). Because the causes of action fail the first prong of the *Village Food* test, they fail the second prong of the test as well. If they did not exist in 1848, they could not have been regarded as actions at law in 1848.

## IV. CONCLUSION

¶ 43. In sum, applying the *Village Food* test, we determine that the claims asserted in the State's com-

---

*Id.* at 420. Rather, the approach of the federal courts in interpreting the federal Constitution places emphasis on the character of the relief sought. "[C]haracterizing the relief sought is 'more important' than finding a precisely analogous common-law cause of action in determining whether the Seventh Amendment guarantees a jury trial." *Id.* at 421 (quoting *Curtis v. Loether,* 415 U.S. 189, 196. (1974).

Our approach in interpreting this state's constitution is different, as we have made clear in *McGrew* and in *Village Food.* We determine whether (1) the cause of action existed, was known, or was recognized at common law in 1848 and (2) whether the cause of action was regarded as at law in 1848. *McGrew,* 285 Wis. 2d 519, ¶ 18; *Vill. Food,* 254 Wis. 2d 478, ¶ 16.

We are not bound by the federal courts' interpretation of the federal Constitution in construing our own constitution. Additionally, we note that the Seventh Amendment is one of the few amendments that does not apply to the states through the Fourteenth Amendment. *Walker v. Sauvinet,* 92 U.S. 90, 92–93 (1875).

plaint do not give rise to a constitutional right to a jury trial. Common law nuisance causes of action are not sufficiently analogous to be considered "essential counterparts" to the modern day regulatory claims asserted here. Therefore, ECI fails the first prong of the *Village Food* test because the claims asserted did not exist, were not known, and were not recognized at common law at the time the state's constitution was adopted.

¶ 44. Our determination, however, does not preclude the constitutional right to a jury trial in all environmental regulatory cases. Such a right exists if the asserted claim has an essential counterpart that existed at common law in 1848 and was recognized as an action at law in 1848. *Vill. Food,* 254 Wis. 2d 478, ¶ 16.

¶ 45. We also note that ECI raised two additional issues on appeal. It alleged insufficiency of the evidence and an erroneous exercise of discretion in assessing statutory forfeitures. In its certification the court of appeals stated, "[w]e are satisfied that these arguments can be addressed under existing law." We agree. Accordingly, we remand the case to the court of appeals for consideration of ECI's arguments regarding sufficiency of the evidence and erroneous exercise of discretion in assessing statutory forfeitures.

*By the Court.*—The judgment and order of the circuit court are affirmed and the cause is remanded to the court of appeals.

¶ 46. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). I join Justice Bradley's opinion.

¶ 47. I write separately to add that I would not remand to the court of appeals the questions of the sufficiency of evidence and the circuit court's exercise of discretion.

¶ 48. Although this court has the power to remand issues to the court of appeals, this court should decide the entire appeal in the instant case in the interest of judicial economy, speedy resolution of appeals, reduced costs to litigants, and finality of decisions. In the instant case, "[r]emand is a wasteful duplication of decisional effort, even when, as in this case, the court of appeals did not consider the issues being remanded as worthy of certification."[1]

¶ 49. The court of appeals does not certify, and this court does not take jurisdiction over, discrete legal questions within the appeal. *See* Wis. Stat. §§ 808.05(2), 809.61 (2005–06). Upon certification from the court of appeals, this court takes jurisdiction of the *entire* case. As our standard certification order explains, "[w]hen this court grants direct review upon certification, it acquires jurisdiction of the case, Wis. Const. art. VII, § 3(3), that is, the entire appeal, which includes all issues, not merely the issues certified or the issue for which the court accepts certification. *State v. Stoehr*, 134 Wis. 2d 66, 70, 396 N.W.2d 177 (1986)."

¶ 50. For the reasons set forth, I write this separate concurrence.

¶ 51. DAVID T. PROSSER, J. (*concurring in part, dissenting in part*). This case is before the court on certification by the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (2005–06).[1]

---

[1] *State v. Stuart*, 2003 WI 73, ¶ 48, 262 Wis. 2d 620, 664 N.W.2d 82 (Abrahamson, C.J., concurring in part and dissenting in part) (citing *Crown Life Ins. Co. v. LaBonte*, 111 Wis. 2d 26, 45, 330 N.W.2d 201 (1983) (Abrahamson, J., concurring in part and dissenting in part)).

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

¶ 52. We are asked to address whether defendants have a constitutional right to a civil jury trial when they are prosecuted for alleged violations of several categories of environmental regulation.

¶ 53. ECI Special Waste Services, Inc. (ECI) is a "centralized waste treater" that, by permit, collects wastewater from industrial customers, processes the wastewater to reduce the concentrations of certain pollutants, and discharges the processed water via sanitary sewer into the City of Fond du Lac's (the City) municipal wastewater treatment plant. William and Jeffrey Schweda (the Schwedas) are co-owners of ECI. The State sued ECI and the Schwedas (collectively, ECI) for violations of the terms of the company's permit, as well as violations of requirements imposed by the state statutes and administrative code. In its prayer for relief, the State sought mainly forfeitures under various provisions of the Wisconsin Statutes.

¶ 54. When ECI demanded a jury trial, the State moved to strike the jury demand. The Circuit Court for Fond du Lac County, Peter L. Grimm, Judge, granted the State's motion, reasoning that ECI failed to show that any of the causes of action in this case satisfied either prong of the test for entitlement to a jury trial set forth in *Village Food & Liquor Mart v. H&S Petroleum, Inc.*, 2002 WI 92, 254 Wis. 2d 478, 647 N.W.2d 177. Thereafter, the case was tried to the court, and the court found ECI liable for some but not all violations alleged in the complaint.

¶ 55. ECI appealed, alleging that the circuit court erred in denying its request for a jury trial. The court of appeals certified the case to us with the following question: "Under the test set forth in *Village Food & Liquor Mart v. H&S Petroleum, Inc.*, 2002 WI 92, 254 Wis. 2d 478, 647 N.W.2d 177, does the constitutional

right to a jury trial attach in an action for violations of waste disposal regulations where common-law nuisance theory provides the foundation for modern environmental law, but forfeiture actions for improper treatment of wastewater and hazardous waste did not exist in 1848?"

¶ 56.  This question requires us to apply the test set forth in *Village Food,* which provides:

> [A] party has a constitutional right to have a statutory claim tried to a jury when: (1) the cause of action created by the statute existed, was known, or recognized at common law at the time of the adoption of the Wisconsin Constitution in 1848; and (2) the action was regarded at law in 1848.

*Village Food,* 254 Wis. 2d 478, ¶ 16.

¶ 57.  Applying this test, I conclude that civil defendants have a constitutional right to trial by jury for certain categories of environmental claims that were recognized as public nuisance actions at common law. Specifically, in this case ECI had a constitutional right to a civil jury trial on claims 1, 4, 5, 7, and 12 because these claims meet the *Village Food* test. These claims are of the same nature as public nuisance actions at common law, which were regarded as actions at law in 1848. They are similar to public nuisance actions because they seek to punish activity that causes harm to public health or public property, especially the waters of the state. Although the harm addressed in some environmental laws is not always of the same magnitude as the harm required at common law, the harm is measurable, tangible, and serious because it affects the integrity of our land and water. The harm addressed in these five claims is direct and

378

immediate, not speculative or remote. Environmental claims that require a civil jury trial are thus distinguishable from claims that require testing, record-keeping, labeling, or reporting—violations that do not directly cause environmental damage.

¶ 58.   The right to civil jury trial in Wisconsin is "inviolate," which means that the legislature may not diminish the right as it existed in 1848. The legislature, however, may expand the right to jury trial by statute. Consequently, judicial interpretation of the constitutional right to a civil jury trial under Article I, Section 5 of the Wisconsin Constitution cannot always be linked to legislative action. Nonetheless, our legislature has confirmed this interpretation of the constitution by labeling the violations alleged in this case a "public nuisance" and by creating criminal counterparts for most of the claims.[2] The existence of criminal counterparts is an indication of the seriousness with which the legislature regards these claims.

¶ 59.   Claims 3, 8, 11, 13, and 14 are not of the same nature as public nuisance at common law. They involve ECI's improper acceptance or storage of waste, including hazardous waste. These claims attempt to head off the improper disposal of waste by prohibiting the improper acceptance or storage of waste. Hence, the harm to water or land is contingent upon disposal. The harm may be probable, but it is not direct and immediate.

---

[2] None of the violations in claim 7 is subject to criminal prosecution. However, claim 7, as pled, alleges direct harm through the discharge of wastewater. Therefore, because claim 7 satisfies the test in *Village Food & Liquor Mart v. H&S Petroleum, Inc.*, 2002 WI 92, 254 Wis. 2d 478, 647 N.W.2d 177, ECI was entitled to receive a jury trial on claim 7.

¶ 60. Claims 9 and 10 are also not of the same nature as public nuisance at common law. These claims do not allege direct and immediate harm to water or land. They are typical of modern regulation in that they impose requirements for sampling, analyzing, and reporting.

¶ 61. Even though the legislature has provided the option for criminal prosecution of violations alleged in claims 3, 8, 9, 10, 11, 13, and 14, ECI did not have a constitutional right to a jury trial on these claims, as long as they were prosecuted civilly. Claim 6 was dropped by the State.

¶ 62. I would affirm the findings and conclusions of the circuit court with respect to claims 3, 8, 9, 10, 11, 13, and 14 and remand the cause to the court of appeals for consideration of ECI's other objections to the judgment on these claims.[3] I would reverse the findings and conclusions of the circuit court with respect to claims 1, 4, 5, 7, and 12 to give ECI a jury trial on these claims.

## BACKGROUND

¶ 63. In 1998 Timothy Miller (Miller) founded ECI, a "centralized waste treater" within the meaning of Wis. Admin. Code § NR 211.03(2e) (Oct., 2002). As part of its operation, ECI would collect wastewater from industrial customers, process the wastewater to reduce the concentrations of certain pollutants, and discharge the processed water via sanitary sewer into

---

[3] On appeal, ECI Special Waste Services, Inc. (ECI) also alleged insufficiency of the evidence and an erroneous exercise of discretion in assessing statutory forfeitures. In its certification, the court of appeals noted that it "was satisfied that these arguments can be addressed under existing law."

the City's municipal wastewater treatment plant. Miller received approval from the Wisconsin Department of Natural Resources (DNR) to obtain a permit from the City to operate ECI. The City issued a pretreatment permit that authorized ECI to discharge wastewater into the City's sewer system but only in accordance with the effluent limitations,[4] monitoring requirements, and other conditions set forth in the permit and in compliance with the requirements of Wis. Admin. Code ch. NR 211 (Oct., 2002).

¶ 64. In 1999 Miller hired William Schweda as a salesman and compensated him in part with ECI stock. In July 2001 Miller sold his remaining shares of ECI to William Schweda's brother, Jeffrey. Ownership of ECI was therefore transferred entirely to William and Jeffrey Schweda, but the Schwedas retained Miller to provide consulting services.

¶ 65. In January 2002 the City experienced an upset at its wastewater treatment plant, causing the City to exceed the City's discharge limits under its permit for oxygen-consuming organic waste and total suspended solids.[5] As part of a broad DNR audit of the City's

---

[4] " 'Effluent limitation' means any restriction established by the department, including schedules of compliance, on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into waters of this state." Wis. Stat. § 283.01(6).

[5] An upset means "an exceptional incident in which there is unintentional and temporary noncompliance with permit effluent limitations because of factors beyond the reasonable control of the permittee. An upset does not include noncompliance to the extent caused by operational error, improperly designed treatment facilities, lack of preventative maintenance, or careless or improper operation." Wis. Admin. Code. NR § 205.03(41) (May, 2001).

operation, the City scheduled a formal inspection of ECI's facility in February 2002. Representatives of both the DNR and the City participated in the inspection. The DNR issued no citations to ECI at that time, but representatives of both the City and State suggested that the Schwedas make some changes in ECI's operations.

¶ 66.  In March/April 2002 the City experienced another upset causing another violation of its permit.

¶ 67.  On May 17, 2002, the DNR served the City with a Notice of Violation, after which the City began a program of collecting and testing samples from ECI.

¶ 68.  On August 21, 2002, the City revoked ECI's permit on the following grounds: (1) ECI made unlawful discharges into the City's sewer system; (2) ECI repeatedly and intentionally falsified sampling and monitoring data; (3) ECI failed to comply with several monitoring and reporting requirements and/or failed to retain records of such monitoring; (4) ECI failed to report changes in the content and volume of wastewater ECI was discharging into the City's system; (5) ECI caused the City to violate the terms of its permit on one and possibly more occasions; (6) on several occasions, ECI discharged wastewater into the City's system far in excess of its permit limits for copper, cyanide, lead, mercury, oil, grease, and zinc; and (7) ECI adjusted the discharge of wastewater, process water, and/or mixed waste streams with the intention of diluting a discharge.

¶ 69.  A year later, on September 11, 2003, the State sued ECI, alleging violations of the terms of the City permit, as well as violations of requirements imposed by the state statutes and state administrative

code.[6] The State made 15 claims for relief.[7]

¶ 70. <u>Claim 1.</u> The State alleged that ECI caused the City to exceed the discharge standards under its permit and therefore violated Wis. Admin. Code § NR 211.10(1) (Oct., 2002). Wisconsin Admin. Code § NR 211.10(1) prohibits industrial users from discharging pollutants into a municipal system "which pass through or interfere with the operation or performance of the [treatment plant], and thereby cause or significantly contribute to a violation of the [municipality's] WPDES permit."[8] The State alleged that "the wastewater defendants discharged into the City's sewer system interfered with the operation of the City's wastewater treatment plant, resulting in the upset, and caused or significantly contributed to the violations of the City's discharge

---

[6] On September 30, 2003, the State also sued the City of Fond du Lac, claiming that the City repeatedly violated its DNR permit by exceeding its effluent limits of harmful wastes into Lake Winnebago. The State alleged that the City failed to effectively monitor its industrial users and specifically pointed to its failure to effectively monitor ECI. The City and the State stipulated to a judgment on the same day and agreed to the following: (1) the City would pay the State $25,000; (2) the City would cooperate with the State in any enforcement action the State or the Department of Natural Resources might pursue against ECI; and (3) the City would continue with facilities planning and implement the selected alternative for upgrading its wastewater treatment facility.

[7] The State amended its complaint on November 30, 2004. The following description of the claims for relief reflects the allegations made in the amended complaint.

[8] WPDES permit stands for "Wisconsin pollutant discharge elimination system permit" and "means a permit issued to a POTW [publicly owned treatment works] under s. 283.31, Stats., for the purposes of controlling pollutant discharge." Wis. Admin. Code NR § 211.03(22) (Oct., 2002); *see* Wis. Admin. Code § NR 208.03(11) (Nov., 2004).

limits." Specifically, the State alleged that ECI began accepting increasing loads of surfactant-laden wastewater from one of ECI's customers. This type of wastewater destroys microbes that are necessary to properly treat the City's wastewater. The State alleged that ECI's discharge of this wastewater caused the City to violate the discharge limits under its permit on two different occasions, once in January and once in March/April 2002.

¶ 71. Claim 2. The State did not appeal the circuit court's dismissal of this claim.

¶ 72. Claim 3. The State alleged that ECI accepted waste streams that it was not permitted to accept. Under Wis. Admin. Code § NR 211.16(1)(c) (Oct., 2002), a centralized waste treater, such as ECI, must submit a report to the municipality identifying the types of waste it intends to treat at least 180 days before commencing discharge. The State alleged that ECI identified metal finishing waste as the only type of categorical waste it intended to treat, and this formed the basis for its permit limitations and the DNR's approval of plans for its treatment facility. Under Wis. Admin. Code § NR 211.16(2), if a centralized waste treater intends to accept a new type of categorical waste not identified in its initial report, it must notify the municipality at least 60 days before accepting such waste. The State alleged that on a number of occasions ECI accepted categorical wastes other than the type it had previously disclosed to the City and the DNR. The unauthorized wastes included organic chemical wastewater on 61 days, pharmaceutical wastewater on 97 days, surfactant-laden waste on 66 days, phosphorus-laden waste on 21 days, unknown waste on 77 days, and septage on 24 days. The State alleged that ECI's treatment system was not designed to properly treat any of

the wastes and that the City was not given the opportunity to evaluate the impacts of the waste and amend the permit limits as appropriate.

¶ 73. Claim 4. The State alleged that ECI exceeded its discharge limits. Wisconsin Admin. Code § NR 261.22(2) (Sept., 1997) imposes limits on the concentrations of pollutants in discharges, and those limits were incorporated into ECI's permit and required under Wis. Admin. Code § NR 211.11(1) (Oct., 2002). The State alleged that ECI violated its oil and grease discharge limits 6 times, its copper limits 18 times, its zinc limits 37 times, its lead limits 17 times, and its cyanide limits 2 times.

¶ 74. Claim 5. The State alleged that ECI failed to notify the City of substantial changes in its discharges. Wisconsin Admin. Code § NR 211.15(6) (Oct., 2002) requires industrial users to "notify the [municipality] in advance of any substantial change in the volume or character of the pollutants" in the discharge. The State alleged that ECI accepted wastewater with a substantial change in the character of the pollutants without notifying the City. Specifically, the State alleged that ECI accepted wastewater that contained high concentrations of phosphorus, BOD%l5%l, and COD; wastewater that contained high levels of surfactants that was anti-bacterial in nature; wastewater that was of unknown character; and wastes with high concentrations of metals.

¶ 75. Claim 6. The State dropped claim 6 in its amended complaint.

¶ 76. Claim 7. The State alleged that ECI failed to comply with approved plans that are required under Wis. Stat. § 281.41 (2003–04). Specifically, the State alleged that ECI (1) discharged wastewater without adequately treating it on at least 163 days; (2) operated

without a flow meter or sampler on 80 days; (3) discharged wastewater without passing through the specified site and/or the flow meter on at least 78 days; (4) discharged wastes and sludge through the truck bay manhole on 108 days; (5) accepted wastes other than from the metal finishing category and non-categorical wastes, as alleged in the third claim; (6) followed improper waste acceptance procedures, failed to ensure that wastes being accepted conformed to the types of waste in ECI's original waste profile, and accepted wastes without proper waste profiles on at least 54 days.

¶ 77. Claim 8. The State alleged that ECI failed to implement proper waste acceptance procedures and, as a result, accepted wastes it was incapable of properly treating and wastes reasonably expected to cause exceedances of the City's effluent limits. This failure resulted in a violation of Wis. Admin. Code § NR 211.16(3) (Oct., 2002), which requires ECI to "implement waste acceptance procedures sufficient to ensure that wastes accepted for treatment are within the centralized waste treater's treatment capabilities and have no characteristics that could reasonably be expected to prevent compliance with the applicable pretreatment standards and requirements."

¶ 78. Claim 9. The State alleged that ECI failed to adequately monitor its effluent. Wisconsin Admin. Code § NR 211.16(4) (Oct., 2002) requires ECI to undertake sufficient sampling and analysis of its effluent to assess its compliance with its permit limits. The State alleged that ECI's permit required it to take "24–hour flow proportional composite samples" of its wastewater discharges into the City's sewerage system. The State alleged that on at least 260 occasions, ECI failed to take

representative samples to assess compliance with permit limits.

¶ 79. Claim 10. The State alleged that ECI failed to submit complete semi-annual reports. Wisconsin Admin. Code § NR 211.16(5) (Oct., 2002) requires ECI to submit to the City a semi-annual report containing various types of information about the wastewater it has treated. The State alleged that two of ECI's semi-annual reports were incomplete and failed to include information such as the name and address of each waste's generator, the volume and date of arrival of each wastewater, and the applicable pretreatment standards.

¶ 80. Claim 11. The State alleged that ECI failed to characterize hazardous waste. Wisconsin Stat. § 291.21 requires any person who generates solid waste to determine if the solid waste is a hazardous waste. The State alleged that ECI accepted waste from two circuit board manufacturers and that the treatment of this waste generated a hazardous waste. The State alleged that ECI failed to characterize this waste as hazardous.

¶ 81. Claim 12. The State alleged that ECI improperly disposed of the hazardous waste. Under Wis. Stat. § 291.21(9), a generator of hazardous waste must ensure that hazardous waste is transported, treated, stored, or disposed of at licensed hazardous waste facilities. The State alleged that at least 5 times ECI disposed of hazardous waste at a non-hazardous, solid waste landfill not authorized to accept such wastes.

¶ 82. Claim 13. The State alleged that ECI operated a hazardous waste facility without an operating license pursuant to Wis. Stat. § 291.25(2)(b). Wisconsin Admin. Code § NR 615.05(4)(a) (May, 1998) provides that a generator who accumulates hazardous waste on-site in containers or tanks for more than 90 days is

deemed an operator of a hazardous waste facility.[9] The State alleged that ECI generated and stored hazardous wastes for over 90 days without a license and therefore unlawfully operated a hazardous waste facility.

¶ 83. <u>Claim 14.</u> The State alleged that ECI illegally handled hazardous waste. Wisconsin Stat. § 291.21(3) requires any person generating hazardous waste to label any container used for storage of hazardous waste to accurately identify its contents and associated hazards. Wisconsin Admin. Code § NR 615.05(4)(a)5. (May, 1998) requires a generator who accumulates waste on-site for periods of 90 days or less to mark each storage container with the date upon which each period of accumulation began. The State alleged that ECI had accumulated hazardous waste in a tank and failed to label the tank as containing hazardous waste or to identify the accumulation start date. In addition, the State alleged that the tank was open in violation of Wis. Admin. Code § NR 615.05(4)(a)2.e. (May, 1998).

¶ 84. <u>Claim 15.</u> The State did not appeal the circuit court's dismissal of this claim.

¶ 85. Based on these claims, the State sought, among other things, forfeitures under Wis. Stat. §§ 281.98(1), 283.91(2), 289.96(3)(a), and 291.97(1);[10]

[9] Effective August 1, 2006, Wisconsin's hazardous waste rules (NR 600 series) were repealed and completely replaced with new rules in the NR 600 series. *See* Wis. Dep't of Natural Res., *New Hazardous Waste and Used Oil Rules,* http://nr.wi.gov/org/aw/wm/hazard/newrules.htm (last visited July 5, 2007).

[10] Wisconsin Stat. chs. 281, 283, 289, and 291 provide penalties for any person who violates the respective chapter or any rule promulgated under the chapter. *See* Wis. Stat. §§ 281.98(1), 283.91(2), 289.96(3)(a), and 291.97(1). The State alleged certain violations of chapters NR 211, 261, and 615 of the Wisconsin Administrative Code. Chapters NR 211 and 261 are promulgated under Wis. Stat. ch. 283. *See* Wis. Admin. Code

the penalty assessment provided for in Wis. Stat. § 757.05(1)(a) (2003–04); the environmental assessment provided for in Wis. Stat. § 299.93; and reasonable and necessary expenses, including the costs of investigation and monitoring as well as attorney fees, pursuant to Wis. Stat. §§ 281.98(2), 283.91(5), and 289.96(3)(b). The State also asked the court to order appropriate injunctive relief.

¶ 86.   ECI demanded a jury trial, and the State moved to strike. The circuit court granted the State's motion, reasoning that ECI failed to show the causes of action in this case satisfied either prong of the test for entitlement to a jury trial set forth in *Village Food.* The case went to trial, and the circuit court found ECI liable for 529 violations alleged in the amended complaint.[11] The circuit court entered judgment for the State against ECI in the amount of $365,373.54.[12]

NR § 211.01 (Oct., 2002); Wis. Admin. Code § NR 261.01 (Sept., 1997); *see also* Wis. Stat. § 283.21(2). Chapter NR 615 is promulgated under Wis. Stat. ch. 291. *See* Wis. Stat. § 291.05; Wis. Admin. Code § NR 615.01 (May, 1998).

[11] The circuit court found ECI and the Schwedas liable for the following: 8 violations under claim 1 at $5000 per violation; 24 violations under claim 3 at $500 per violation; 80 violations under claim 4 at $1000 per violation; 28 violations under claim 5 at $10 per violation; 80 violations under claim 7 at $100 per violation; 54 violations under claim 8 at $10 per violation; 120 violations under claim 9 at $500 per violation; 2 violations under claim 10 at $2500 per violation; 2 violations under claim 11 at $100 per violation; 5 violations under claim 12 at $100 per violation; 120 violations under claim 13 at $100 per violation; and 6 violations under claim 14 at $100 per violation. The total forfeitures awarded by the court were $219,120.

[12] The judgment comprised the following: forfeitures of $219,120; statutory surcharges of $76,801; attorney fees of $40,000; costs of $4452.54; and costs of investigation to the DNR of $25,000.

¶ 87. ECI appealed, alleging that the circuit court erred in denying its request for a jury trial. The court of appeals certified the case to this court, asking whether the "constitutional right to a jury trial attach[es] in an action for violations of waste disposal regulations where common-law nuisance theory provides the foundation for modern environmental law, but forfeiture actions for improper treatment of wastewater and hazardous waste did not exist in 1848?"

## STANDARD OF REVIEW

¶ 88. Article I, Section 5 of the Wisconsin Constitution governs a civil litigant's right to a jury trial in a Wisconsin court. The court is asked to decide whether Article I, Section 5 guarantees ECI the right to a jury trial. "Whether there is a constitutionally guaranteed right to a jury trial for a particular cause of action requires us to interpret a provision of the state constitution, which we do independently of the lower courts." *Village Food,* 254 Wis. 2d 478, ¶ 7.

## ANALYSIS

A.  The Constitutional Right to a Civil Jury Trial and the *Village Food* Test

¶ 89. Trial by jury is a highly valued attribute of American government. It was regarded by the founders as "an essential bulwark of civil liberty." *Galloway v. United States,* 319 U.S. 372, 397 (1943) (Black, J., dissenting in part, concurring in part). In *Jacob v. New York City,* 315 U.S. 752 (1942), Justice Murphy cautioned:

> The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of

federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts.

*Id.* at 752–53. The Seventh Amendment to the United States Constitution protects civil jury trials in federal courts.[13] Although the Supreme Court has not applied the Seventh Amendment to the states,[14] most states have embodied a right of trial by jury in civil cases in their own constitutions. Only three have not.[15] In most of the 47 states that do have a constitutional right, there is emphatic language in the text to the effect that the right shall "remain inviolate."[16]

---

[13] The Seventh Amendment provides, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

[14] *See* Sarah A. Monroe, Note, State ex rel. Ohio Academy of Trial Lawyers v. Sheward: *Will the Right to a Jury Trial Remain Inviolate?,* 53 Ark. L. Rev. 931, 941 (2000) (citing *Minneapolis & St. Louis R.R. Co. v. Bombolis,* 241 U.S. 211, 217 (1916), and *Colclasure v. Kan. City Life Ins. Co.,* 720 S.W.2d 916, 918 (1986)).

[15] *See id.* at 942 n.106 (citing Colorado, Louisiana, and Wyoming as those states that do not provide a right to a civil jury trial).

[16] *See, e.g.,* Ala. Const. art. I, § 11; Ariz. Const. art. II, § 23; Ark. Const. art. II, § 7; Cal. Const. art. 1, § 16; Conn. Const. art. I, § 19; Fla. Const. art. I, § 22; Ga. Const. art. I, § 1, ¶ 11; Idaho Const. art. I, § 7; Ill. Const. art. I, § 13; Ind. Const. art. I, § 20; Iowa Const. art. I, § 9; Kan. Const. Bill of Rights § 5; Ky. Const. Bill of Rights § 7; Minn. Const. art. I, § 4; Miss. Const. art. 3, § 31; Mo. Const. art. I, § 22(a); Mont. Const. art. II, § 26; Neb.

¶ 90. The Wisconsin Constitution is one of the constitutions that includes such language. It provides in relevant part, "The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy." Wis. Const. art. I, § 5. The meaning of the phrase "shall remain inviolate" has been subject to extensive debate. As one commentator has noted, "For a right to remain inviolate, it must not diminish over time and must be protected from all assaults." Joseph D. Jamail, Jr., Essay, *The Jury System,* 43 Houston Lawyer 18, 19, Sept.-Oct. 2005. This court has noted that the phrase, "the right of trial by jury shall remain inviolate," refers "to the state of the law as it existed at the formation of the constitution, and means that this right shall continue as it was at the time of formation and adoption of the constitution." *Gaston v. Babcock,* 6 Wis. 490 [*503], 494 [*506] (1857).

¶ 91. The phrase "shall remain inviolate" does not *extend* the right of trial by jury; rather, it *preserves* the right in civil cases as it existed at the time our constitution was adopted. It is important to note that in 1848, as now, not all civil matters were tried to a jury. "Issues in actions at law were so tried, with some exceptions; issues in suits in equity were not, unless the chancellor in his discretion sent an issue to a jury for an advisory verdict." James Fleming, Jr., *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655, 655 (1962–63). The

---

Const. art. I, § 6; Nev. Const. art. I, § 3; N.J. Const. art. 1, § 9; N.M. Const. art. II, § 12; N.Y. Const. art. I, § 2; N.C. Const. art. I, § 25 (stating, "the ancient mode of trial by jury . . . shall remain sacred and inviolable); N.D. Const., art. I, § 13; Ohio Const. art. I, § 5; Or. Const. art. 1, § 17; Okla. Const. art. II, § 19; Pa. Const. art. I, § 6; R.I. Const. art. I, § 15; S.C. Const. art. I, § 14; S.D. Const. art. VI, § 6; Tenn. Const. art. I, § 6; Tex. Const. art. I, § 15; Wash. Const. art. I, § 21; Wis. Const. art. I, § 5.

phrase "clearly indicates that *non-statutory* causes of action at law, where a jury trial was guaranteed before the passage of the state constitution, would continue to have a guaranteed right to a jury trial attached even after the passage of the constitution." *Village Food,* 254 Wis. 2d 478, ¶ 10.

¶ 92. The question of a constitutional right to a civil jury trial becomes murkier when statutory causes of action are involved.[17] Statutory causes of action are by definition not common law causes of action; however, this court has declined to interpret the Wisconsin Constitution narrowly to exclude all statutory causes of action from the purview of the constitutional right to a civil jury trial.

¶ 93. In *State v. Ameritech Corp.,* 185 Wis. 2d 686, 517 N.W.2d 705 (Ct. App. 1994), the court of appeals set forth a two part test to determine whether a party has a constitutional right to have a statutory claim tried to a jury: "(1) the statute codifies an action known to the common law in 1848; *and* (2) the action was regarded as at law in 1848." *Id.* at 690. In *Village Food,* we expanded upon the first prong of the test, finding that it resulted in too narrow an interpretation of our Constitution. We restated the test as follows:

[A] party has a constitutional right to have a statutory claim tried to a jury when: (1) the cause of action created by the statute existed, was known, or recognized at common law at the time of the adoption of the

---

[17] The legislature may explicitly provide a statutory right to a civil jury trial, as it did for statutory actions under Wis. Stat. chs. 26–31. *See* Wis. Stat. §§ 23.50, 23.77. Where the legislature does not explicitly provide a statutory right to a civil jury trial, as is in this case, the question remains whether the constitutional right to a civil jury trial attaches to the statutory cause of action. *See* Wis. Stat. § 805.01.

> Wisconsin Constitution in 1848; and (2) the action was regarded as at law in 1848.

*Id.,* ¶ 16.

¶ 94.  Three years later, the *Village Food* test was applied to a motorist's demand for a 12–person jury in a civil forfeiture trial for speeding. *Dane County v. McGrew,* 2005 WI 130, 285 Wis. 2d 519, 699 N.W.2d 890. We concluded that the motorist had a constitutional right to a jury trial of six persons as existed for certain offenses in 1848, even though we could find no practical counterpart for speeding at common law. The majority determined that the court should not focus narrowly on individual traffic violations but rather on whether "rules of the road" existed at common law at the time the Wisconsin Constitution was adopted. *Id.,* ¶¶ 56–58 (Bradley, J., concurring on behalf of four justices). Thus, *McGrew* gave an expansive interpretation to the *Village Food* test.

B.   Application of the *Village Food* Test

¶ 95.  In this case, the State sued ECI, alleging violations of the Wisconsin Statutes and the Wisconsin Administrative Code. It is thus necessary to apply the *Village Food* test to the State's causes of action to determine whether ECI had a constitutional right to have the State's claims tried to a jury. The analysis begins with the first prong of the *Village Food* test to resolve whether the causes of action in this case existed, were known or recognized at common law at the time of the adoption of the Wisconsin Constitution.

1.   First Prong of the *Village Food* Test

¶ 96.  The inquiry under the first prong requires that we examine the statutory causes of action in this

case and to determine whether they are "of the same nature" or are essentially "counterparts" to any causes of action that existed at common law in 1848. *See Village Food,* 254 Wis. 2d 478, ¶¶ 27, 28. We search for common law causes of action that were the "forerunners" of the statutory causes of action in this case. *Id.,* ¶ 27. The fact that the present causes of action "differ slightly" from a common law cause of action does not vitiate the analogy. *Id.,* ¶ 28.

¶ 97.  The State alleged violations of requirements imposed by the Wisconsin Statutes and by the Wisconsin Administrative Code, namely certain provisions in Wis. Stat. chs. 281, 283, 289, 291, and certain provisions in Wis. Admin. Code chs. NR 211, 261, and 615. Before delving into the specific allegations of the claims the State took to trial, I review the general nature of the statutory chapters.

¶ 98.  Wisconsin Stat. chs. 281 (Water and Sewage), 283 (Pollution Discharge Elimination), 289 (Solid Waste Facilities), and 291 (Hazardous Waste Management) are environmental statutes designed to enable the State to carry out its role in protecting the environment and public health from improper management of wastewater and hazardous waste.[18] The purpose of subchapter II of Wis. Stat. ch. 281 is to "grant necessary powers and to organize a comprehensive program under a single state agency for the enhancement of the quality management and protection of all waters of the state, ground and surface, public and private." Wis. Stat. § 281.11. Any person who violates this chapter or any rule promulgated under this chapter is subject to

---

[18] One of the first explicit environmental statutes appeared in 1923 and was entitled "Water, Ice, Sewage, and Refuse." Ch. 448, Laws of 1923 (codified at Wis. Stat. ch. 144 (1923)).

civil forfeitures for each violation. *See* Wis. Stat. § 281.98(1). The policy of Wis. Stat. ch. 283 is to "restore and maintain the chemical, physical, and biological integrity of [Wisconsin] waters to protect public health, safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial, agricultural, and other uses of water." Wis. Stat. § 283.001. The provisions of this chapter are intended to effectuate that policy. *Id.* Any person who violates this chapter or any rule promulgated under this chapter may be proceeded against civilly or criminally. *See* Wis. Stat. § 283.91(1), (2), and (3). Chapter 289 requires the promulgation of rules establishing minimum standards for the location, design, construction, sanitation, operation, monitoring, and maintenance of solid waste facilities. Wis. Stat. § 289.05(1). Any person who violates this chapter or any rule promulgated under this chapter is subject to civil forfeitures. *See* Wis. Stat. § 289.96. The policy of Wis. Stat. ch. 291 is to ensure proper management of hazardous waste in order to protect against substantial danger to the environment, public health, and safety. Wis. Stat. § 291.001. Any person who violates this chapter or any rule promulgated under this chapter may be proceeded against civilly or criminally. *See* Wis. Stat. § 291.97(1) and (2).

¶ 99.   Wisconsin Admin. Code ch. NR 211 is a set of rules promulgated pursuant to Wis. Stat. ch. 283 and its purpose is to:

> establish, under s. 283.55(2), Stats., the responsibilities of industrial users and of publicly owned treatment works [POTW] in preventing the discharge into publicly owned treatment works of pollutants which will interfere with the operation of the POTW, which will

> pass through the POTW treatment works insufficiently treated, or which will impair the use or disposal of POTW sludge.

Wis. Admin. Code § NR 211.01 (Oct., 2002). Wisconsin Admin. Code ch. NR 261 is also promulgated pursuant to Wis. Stat. ch. 283, and its purpose is to establish standards of performance, effluent limitations, and pretreatment standards for discharges of wastes from the metal finishing point source category into the waters of the state and POTWs. Wis. Admin. Code § NR 261.01 (Sept., 1997); *see* Wis. Stat. § 283.21(2). Finally, Wis. Admin. Code ch. NR 615 is promulgated under Wis. Stat. ch. 291 and its purpose is to "specify the requirements that apply to the generators of large quantities of hazardous waste." Wis. Admin. Code § NR 615.01 (May, 1998); *see* Wis. Stat. § 291.05.

¶ 100.  The court must decide whether causes of action brought under these chapters existed, were known or recognized in 1848. ECI argues that these causes of action were cognizable in 1848 as common law nuisance actions. The court of appeals certified the case to us with a question that implicitly asked us to compare the causes of action in this case to common law nuisance. Thus, our inquiry focuses on whether the statutory causes of action in this case are of similar nature or are essentially counterparts to the common law nuisance action.[19]

---

[19] To answer this inquiry, I refer to a variety of sources, such as the 1849 Revised Statutes of Wisconsin; case law from Wisconsin, other states, and England pre-dating and surrounding the adoption of the Wisconsin Constitution; William Blackstone's *Commentaries on the Laws of England* (1765–69); the 1787 ordinance establishing the Northwest Territory; and the 1836 ordinance establishing the territorial government in

¶ 101. At common law, nuisances were of two types: public or common nuisances and private nuisances. The historical definition of a public nuisance was very broad and "came to include 'any act not warranted by law, or omission to discharge a legal duty, which inconveniences the public in the exercise of rights common to all Her Majesty's subjects.' " William L. Prosser, *Handbook of the Law of Torts* § 86, at 572 (4th ed. 1971) (quoting Stephen, *General View of the Criminal Law of England* 105 (1890)). William Black-

Wisconsin. *See Dane County v. McGrew,* 2005 WI 130, ¶¶ 23 n.18, 26, 285 Wis. 2d 519, 699 N.W.2d 890; *Village Food & Liquor Mart v. H&S Petroleum, Inc.,* 2002 WI 92, ¶¶ 23–24, 254 Wis. 2d 478, 647 N.W.2d 177.

I refer to case law from England and other states to understand the common law as it existed in 1848. "Article XIV, Section 13 [of the Wisconsin Constitution] specifically incorporates the common law of England as it existed in 1776 into the law of this state." *State v. Picotte,* 2003 WI 42, 261 Wis. 2d 249, 661 N.W.2d 381. Article XIV, Section 13 provides: "Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature." Although English decisions issued after the American Revolution in 1776 are not specifically incorporated into Wisconsin's common law, *see Cawker v. Dreutzer,* 197 Wis. 98, 133, 221 N.W.401 (1928), we may refer to them and cases from other states "to ascertain the principles and rules of the common law." 15A Am. Jur. 2d Common Law § 4 (2007). We refer to Blackstone's *Commentaries* because they "have been accepted as a satisfactory exposition of the common law of England." *Id.,* § 1.

I examine the 1849 Revised Statutes of Wisconsin because they were intended to " 'collate and revise all the public acts of the state of a general and permanent nature,' as of July 1848." *See McGrew,* 285 Wis. 2d 519, ¶ 23, n.18 (citing Revised Statutes of Wisconsin (1849) at iii).

stone defined public nuisances as "a species of offences against the public order and []economical regimen of the state; being either the doing of a thing to the annoyance of all the king's subjects, or the neglecting to do a thing which the common good requires." 4 William Blackstone, *Commentaries on the Laws of England,* ch. 13, at 166–67 (1769). A classic example of a public nuisance was obstructing the king's highway and all those who happen to travel there. *Soltau v. De Held,* (1851) 61 Eng. Rep. 291, 295. Other historic examples of public nuisances include the keeping of hogs in any city or market town, disorderly inns or ale houses, lotteries, and the making and selling of fireworks. 4 Blackstone, *supra,* at 167.[20]

[20] Public nuisances also included:

> *interferences with the public health,* as in the case of a hogpen, the keeping of diseased animals, or a malarial pond; with the public safety, as in the case of the storage of explosives, the shooting of fireworks in the streets, harboring a vicious dog, or the practice of medicine by one not qualified; with public morals, as in the case of houses of prostitution, illegal liquor establishments, gambling houses, indecent exhibitions, bullfights, unlicensed prize fights, or public profanity; with the public peace, as by loud and disturbing noises, or an opera performance which threatens to cause a riot; *with the public comfort, as in the case of bad odors, smoke, dust and vibration; with public convenience, as by obstructing* a highway or *a navigable stream,* or creating a condition which makes travel unsafe or highly disagreeable, or the collection of an inconvenient crowd; and in addition, such unclassified offenses as eavesdropping on a jury, or being a common scold.

William L. Prosser, *Handbook of the Law of Torts* § 86, at 572 (4th ed. 1971) (emphasis added) (footnotes omitted).

This court provided a contemporary definition of public nuisance in *Physicians Plus v. Midwest Mutual Insurance Co.,* 2002 WI 80, ¶ 2, 254 Wis. 2d 77, 646 N.W.2d 777: "[A public nuisance is] a condition or activity which substantially or unduly interferes with the use of a public place or with the activities of an entire community."

¶ 102.  A private nuisance, on the other hand, was defined as an "invasion of interests in the use or enjoyment of land."[21] *Id.* Historic examples of private nuisances include the erection of a house or other buildings so near to another's that they obstruct the "ancient lights" or windows; the keeping of hogs or other noisy animals so near the house of another "that the stench of them incommodes him and makes the air unwholesome"; and the act of diverting water "that used to run to another's meadow[] or mill." 3 William Blackstone, *Commentaries on the Laws of England,* ch. 13, at 217–18 (1768).

¶ 103.  In sum, private nuisances involve injuries to individual property, and public nuisances involve injuries to the properties of mankind. *Attorney-Gen. v. Sheffield Gas Consumers' Co.,* (1853) 43 Eng. Rep. 119, 125. Private nuisances were brought at the suit of the individual, while public nuisances were brought at the suit of the attorney general.[22] George V. Yool, *An Essay on Waste, Nuisance, and Trespass* 85 (1863).

---

[21] This court summarized the difference between a public and private nuisance in *Milwaukee Metropolitan Sewerage District v. City of Milwaukee,* 2005 WI 8, ¶ 30, 277 Wis. 2d 635, 691 N.W.2d 658:

> In sum, a nuisance exists if there is a condition or activity that unduly interferes with the private use and enjoyment of land or a public right. If the interest invaded is the private use and enjoyment of land, then the nuisance is considered a private nuisance. Conversely, if the condition or activity interferes with a public right or the use and enjoyment of public space, the nuisance is termed a public nuisance.

[22] A private plaintiff could bring a claim for public nuisance where the private plaintiff "suffer[ed] some extraordinary damage, beyond the rest of the king's subjects." 3 William Blackstone, *Commentaries on the Laws of England,* ch. 13, at 220 (1768).

¶ 104. Nuisance actions were often authorized by statute. For instance, Section 129 of the 1827 Revised Code of Laws of Illinois authorized prosecution of any person who "shall in any wise obstruct or pollute any water course, lake, pool, marsh, or common sewer, or continue such . . . pollution, so as to render the same offensive or unwholesome." Revised Code of Laws of Illinois, § 129, p. 150–51 (1827). Section 129 provides:

> If any person shall obstruct or injure or cause or procure to be constructed or injured, any public road or highway, or common street or alley of any town or village, or any public bridge, causeway, public river, or other stream declared navigable by law; or shall continue such obstruction, so as to render the same inconvenient or dangerous to pass; or shall erect or establish any offensive trade, manufacture or business, or continue the same, after it has been erected or established to the common disturbance, annoyance, nuisance or detriment of the county, town, village, or neighborhood where the same may be erected or established; *or shall in any wise obstruct or pollute any water course, lake, pool, marsh, or common sewer, or continue such obstruction or pollution, so as to render the same offensive or unwholesome to the county, town, village or neighborhood thereabout;* every person so offending shall, upon conviction thereof, be fined not exceeding one hundred dollars; and every such nuisance may, by order of the circuit court before whom the conviction shall take place, be removed and abated by the sheriff of the proper county; and any inquest and judgment thereon had, under the provisions of any law authorizing a writ of *ad quod damnum,* shall be no bar to prosecution under this section.

Revised Code of Laws of Illinois, § 129, p. 150–51 (1827) (emphasis added).

¶ 105. In 1832 the Territory of Michigan authorized local officials to "take such measures as they may

401

deem effectual for the preservation of the public health." Laws of the Territory of Michigan, § 1, p. 561 (1833). "Every person who shall violate any order, rule, or regulation, made in pursuance of the powers granted to the said [local officials], shall be deemed guilty of a misdemeanor, punishable by fine or imprisonment, in the discretion of the court before whom the offender shall be tried." *Id.,* § 2, p. 562. Other parts of this Act describe "putrid articles" and "articles likely to endanger the public health." *Id.,* § 4, p. 562.

¶ 106. In 1839 the Statutes of the Territory of Wisconsin contained a similar provision for preservation of the public health. The statute addressed "any unsound or putrid articles . . . likely to endanger the public health." Statutes of the Territory of Wisconsin, § 5, p. 125 (1839). Failure to remove such articles resulted in a forfeiture. *Id.* There were also forfeitures for persons who destroyed dams or filled ditches or drains. *Id.,* § 34, p. 355; § 44, p. 112.

¶ 107. In 1848 Wisconsin recognized actions for both public and private nuisances. Chapter 110 of the Wisconsin Revised Statutes of 1849 recognized actions for private nuisances, while chapter 26 recognized actions for public nuisances. *See* Wis. Rev. Stat. chs. 26, 110 (1849).

¶ 108. The public nuisance statute reads:

> The board of health may examine into all nuisances, sources of filth, and causes of sickness, and make such regulations respecting the same as they may judge necessary for the public health, and safety of the inhabitants; and every person who shall violate any order or regulation, made by any board of health, and duly published agreeably to the provisions of this chapter, shall be deemed guilty of a misdemeanor, and

punished by a fine not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months.

Wis. Rev. Stat. ch. 26, § 3 (1849).[23] Notably, the Revised Statutes also provided for a forfeiture of a sum not to

---

[23] A variation on this statute appears in the 1889 Wisconsin Statutes:

> 20. To appoint a board of health, which shall have all the powers of such boards under the general laws of the state; to provide hospitals and regulate the burial of the dead, and the return of bills of mortality; *to declare what are nuisances, and to prevent or abate the same;* to require the owner or occupant of any grocery, cellar, tallow chandler's shop, soap factory, tannery, stable, barn, privy, sewer, or other unwholesome or nauseous house, building or place, to remove or abate the same, or to cleanse it as often as may be deemed necessary for the public health; to direct the location and management of slaughter houses subject to the provisions of section one thousand four hundred and eighteen, and to prevent the erection, use or occupation of the same, except as authorized by them; to prevent persons from bringing, depositing or leaving within the village any putrid carcass, or other unwholesome substance; to require the owners or occupants of lands to remove dead animals, *stagnant water, or other unwholesome substance from their premises, and to provide for the cleansing* and removal of obstructions from *any river, stream, slough or water course within the limits of the village,* and to prevent the obstruction or retarding of the flow of water therein, *or the putting of anything into the same which may be prejudicial to the health of the village.*

Sandborn & Berryman Ann. Stats. of Wis., § 892, p. 519 (1889) (emphasis added). Paragraph 20 gives a village board the power "to appoint a board of health, which shall have all the powers of such boards under the general laws of the state . . . to declare what nuisances are, and to prevent or abate the same . . . to prevent the obstruction or retarding of the flow of water . . . or the putting of anything into the same which may be prejudicial to the health of the village." This section is cited in *Kilvington v. City of Superior,* 83 Wis. 222, 53 N.W. 487 (1892), where the court said:

exceed fifty dollars if the owner failed to remove the nuisance within twenty four hours. Wisconsin Rev. Stat. ch. 26, ¶ 5 states,

> Whenever any nuisance, source of filth, or cause of sickness shall be found on private property, the board of health shall order the owner or occupant thereof, at his own expense, to remove the same within twenty-four hours; and if the owner or occupant shall neglect to do so, he shall forfeit a sum not exceeding fifty dollars.

Thus, nuisances were prosecuted under the Wisconsin Statutes.

¶ 109. In determining whether the causes of action in the present case are similar to actions at common law, the appropriate focus is on public nuisance rather than private nuisance. Nonetheless, private nuisance cases may serve to illustrate the kind of injuries to land or water that were actionable at com-

> The power "to prevent or abate nuisances"—that which occasions public hurt or inconvenience—is necessarily a very broad and comprehensive one . . . . It would hardly be questioned by any one if garbage, manure, or dead animals were found within the village, in the interest of good order, cleanliness, and public health the board of trustees would have power to abate such nuisances . . . . To this end it might provide for destroying them, instead of fouling the waters of a lake or stream of water with them, to be again cast up, to the prejudice of the public, or depositing them where they would create a new nuisance.

*Id.* at 225–26.

Section 4608 of the 1889 statutes provides for the enforcement of orders and regulations of any board of health: "Any person who shall wilfully violate, any law relating to the public health, or any order or regulation of any board of health, lawfully made and duly published, shall be punished by imprisonment in the county jail, not more than three months, or by a fine not exceeding one hundred dollars." Sandborn & Berryman Ann. Stats. of Wis., § 4608, p. 2317 (1889).

mon law and that might be deemed public nuisances if they harmed or seriously inconvenienced the public. *Cf., Walker v. Shepardson,* 2 Wis. 282 [*384], 291 [*396] (1853) (concluding that a public nuisance that caused private and special injury to the plaintiff was actionable in law or equity).

¶ 110. The causes of action in this case, dealing with water pollution and hazardous waste, are based upon what can be fairly characterized as environmental statutes. Scholarly commentary recognizes the link between modern statutory environmental law and the common law of nuisance. As one commentator has noted, "The deepest doctrinal roots of modern environmental law are found in principles of nuisance." William H. Rodgers, Jr., *Handbook on Environmental Law* § 2.1, at 100 (1977). The Seventh Circuit in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers,* 101 F.3d 503 (7th Cir. 1996), acknowledged that the "interests [of environmental statutes] overlap to a great extent the interests that nuisance law protects." *Id.* at 505. Other commentators have noted that "[w]hen you go back to the early history of environmental law, the one substantive area that you would want to turn to more than any other would be the common law of nuisance." Richard A. Epstein, *Regulation—And Contract—In Environmental Law,* 93 W. Va. L. Rev. 859, 862 (1990–91).

¶ 111. Yet another commentator has noted, "Because of its flexibility, common law nuisance continues to play a vital role in complementing statutory environmental enforcement tools . . . . Environmental harm is the quintessential public nuisance. In fact, modern environmental and energy statutes are codifications of the common law of public nuisance." Matthew F. Pawa & Benjamin A. Krass, *Behind the Curve: The National*

*Media's Reporting on Global Warming,* 33 B.C. Envtl. Aff. L. Rev. 485, 487–88 (2006).[24]

[24] *See also* Charlie Garlow, *Environmental Recompense,* 1 Appalachian J.L. 1 (2002); Melanie R. Kay, *Environmental Negligence: A Proposal for a New Cause of Action for the Forgotten Innocent Owners of Contaminated Land,* 94 Cal. L. Rev. 149, 151 (2006); Oliver A. Houck, *Why Do We Protect Endangered Species, and What Does That Say About Whether Restrictions on Private Property to Protect Them Constitute "Takings"?,* 80 Iowa L. Rev. 297, 326 (1995) (stating, "A better explanation may be the close relationship between environmental laws and their genesis, the law of nuisance. In the beginning, there was nuisance law."); Ray Kirsch, *What's the Buzz? Common Law for the Commons in Anderson v. State Department of Natural Resources,* 29 Hamline L. Rev. 338, 349 (2006) (stating, "The common law is the historical root of environmental law, and prior to World War II, was the primary means of addressing environmental harms. During this period, state and local governments were forefront in addressing issues of public health and nuisance and did so by balancing community interests and imposing (or not) liability for harms."); Albert C. Lin, *The Unifying Role of Harm in Environmental Law,* 2006 Wis. L. Rev. 897, 899 (2006) (stating, "Nuisance actions [are] the precursors to modern environmental law."); Randy Lowell, *Private Actions and Marine and Water Resources: Protection, Recovery and Remediation,* 8 S.C. Envtl. L.J. 143, 161 (2000); Kenneth A. Manaster & Daniel P. Selmi, 1 State Envtl. L. § 11:1 (2006) (stating, "Before the advent of modern environmental law, parties employed nuisance law to resolve disputes over water pollution."); Jonathan L. Mayes, *The Right to Trial by Jury in Environmental Cost-Recovery and Contribution Actions: United States v. England,* 10 Alb. L. Envtl. Outlook 71, 80 (2005) (stating, "Nevertheless, the truth remains that the common law ancestors of nuisance and trespass law produced the theoretical framework for modern environmental law."); John C. O'Quinn, *Not-So-Strict Liability: A Forseeability Test for* Rylands v. Fletcher *and Other Lessons From* Cambridge Water Co. v. Eastern Counties Leather PLC, 24 Harv. Envtl. L. Rev. 287, 287 (2000); Arnold W. Reitze, Jr., *The Legislative*

¶ 112. The Wisconsin Legislature has formally adopted this principle by labeling the violations of the environmental statutes at issue in this case "a public nuisance." Wisconsin Stat. § 299.95 states, "For purposes of this proceeding where chs. 281 to 285 and 289 to 295 or this chapter or the rule, special order, license, plan approval, permit or certification prohibits in whole or in part any pollution, a violation is considered *a public nuisance*." Wis. Stat. § 299.95 (emphasis added).

¶ 113. This authority supports the conclusion that, on a general level, the common law of nuisance is a "forerunner" to modern environmental statutory law. Of course, there are distinctions between the common

---

*History of U.S. Air Pollution Control,* 36 Hous. L. Rev. 679, 680 (1999) (stating, "The legal roots of air pollution control are found in common law tort remedies."); J.B. Ruhl, *Ecosystem Services and the Common Law of "The Fragile Land System",* Natural Res. Envt., Fall 2005, at 3, 3; J.B. Ruhl, *Farms, Their Environmental Harms, and Environmental Law,* 27 Ecology L.Q. 263, 315 (2000) (stating, "It has often been said that the statutory form of modern environmental law is built on the backbone of the common law of nuisance."); Ronald J. Rychlak, *Common-Law Remedies for Environmental Wrongs: The Role of Private Nuisance,* 59 Miss. L.J. 657, 661 (1989) (stating, "Despite several recent legislatively enacted causes of action, common-law private nuisance is the 'oldest and perhaps most useful legal theory' for environmental plaintiffs." (footnote omitted)); Joseph Schilling & Leslie S. Linton, *The Public Health Roots of Zoning: In Search of Active Living's Legal Genealogy,* Am. J. Prev. Med., 2005, at 96, 98; A. Dan Tarlock, *The Future of Environmental "Rule of Law" Litigation,* 17 Pace Envtl. L. Rev. 237, 249 (2000); David A. Westbrook, *Liberal Environmental Jurisprudence,* 27 U.C. Davis L. Rev. 619, 633 (1994); Bradford W. Wyche, *A Guide to the Common Law of Nuisance in South Carolina,* 45 S.C. L. Rev. 337, 338 (1994) (stating, "Nuisance theory and case law is the common law backbone of modern environmental and energy law.").

law of nuisance and modern environmental statutory law. Modern environmental statutory law tends to be regulatory and focuses more on preventing the cumulative and future effects of conduct than the common law of nuisance. The term nuisance, which is derived from the Latin word nocumentum, meaning simply "harm,"[25] requires a showing of substantial and unreasonable harm to interests in the use and enjoyment of land.[26] *See* Prosser, *supra,* at 580. Under the common law of nuisance, a party should not seek recovery "until an actual nuisance has been committed, or at all events until it is quite clear that the [conduct] will inevitably result in a nuisance." Yool, *supra,* at 95; *see also Haines v. Taylor,* (1846) 50 Eng. Rep. 511. Under modern environmental statutory law, on the other hand, the conduct need not result in actual or imminent harm of the same magnitude for it to be actionable. Modern statutory environmental law regulates "more subtle and attenuated harms"[27] and seeks to prevent harm before it occurs.

---

[25] *See* Wyche, *supra* note 24, at 349.

[26] For examples of such harm, see *Tate v. Parrish,* 7 T.B. Mon. 325 (Ky. Ct. App. 1828) (describing dead hog that was thrown into neighbor's spring as causing stench and corrupting the water of the spring); *Mills v. Richards,* 9 Wend. 315 (N.Y. 1832) (describing overflow of dam that caused sickness (fever and ague) to plaintiff and his family); *Neal v. Henry,* 19 Tenn. 17 (Tenn. 1838) (describing overflow of dam that caused stagnant and impure water and caused plaintiff's family to become unhealthy and sick). *But see Wood v. Waud,* (1849) 154 Eng. Rep. 1047, 1057 (concluding that plaintiffs had been injured as of right even where defendant's pollution of the stream caused no actual damage to plaintiffs because the stream was already polluted by similar acts of mill owners).

[27] *See Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs,* 101 F.3d 503, 505 (7th Cir. 1996) (stating,

¶ 114. This distinction is not significant enough to invalidate the analogy between the common law of public nuisance and modern environmental statutory law. Harm is a key element of public nuisance; thus some environmental claims do not warrant a jury trial because these environmental statutes are largely preventative and seek to regulate conduct in which the resulting harm is neither direct nor immediate. Claims under other environmental statutes do warrant a jury trial because these environmental statutes proscribe conduct in which the resulting harm is direct and immediate.[28] In this case, then, the task is to analyze

"Indeed, the major difference is that environmental statutes regulate more subtle and attenuated harms than the common law of nuisance does; a land use that creates a common law nuisance is thus likely to be an *a fortiori* violation of statutory environmental law.").

[28] When applying its test for a jury trial under the Seventh Amendment, the United States Supreme Court also found environmental statutory causes of action under the Clean Water Act to be analogous to the common law of public nuisance.

In an opinion by Justice Brennan, the Court held that the defendant had a constitutional right to a civil jury trial under the Seventh Amendment on an action brought by the Federal Government seeking civil penalties and injunctive relief under the Clean Water Act. *Tull v. United States,* 481 U.S. 412 (1987). "The Clean Water Act prohibits discharging, without a permit, dredged or fill material into 'navigable waters,' including the wetlands adjacent to the waters." *Id.* at 414. The Government sued the defendant, a real estate developer, for dumping fill on wetlands and placing fill in a manmade waterway. *Id.* The defendant demanded a jury trial, but his request was denied. *Id.* at 415. The Fourth Circuit Court of Appeals affirmed the District Court's denial of a jury trial. *Id.* at 416.

The Supreme Court reversed, holding that the Seventh Amendment guarantees a jury trial to determine liability in

each claim to determine whether the claim alleges some harm that, although not necessarily of the same magnitude required at the common law, is direct and

actions by the Government seeking primarily civil penalties under the Clean Water Act. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Seventh Amendment requires "a jury trial on the merits in those actions that are analogous to 'Suits at common law.' " *Id.* at 417.

To determine whether the statutory action was analogous to a suit at common law, the Court examined both (1) the nature of the statutory action; and (2) the nature of the remedy sought. *Id.* The Court concluded that "both the public nuisance action and the action in debt are appropriate analogies to the instant statutory action." *Id.* at 420. Citing William Prosser, *Law of Torts* 583 (4th ed. 1971), the Court noted that "[t]he essential function of an action to abate a public nuisance was to provide a civil means to redress 'a miscellaneous and diversified group of minor criminal offenses, based on some interference with the interests of the community, or the comfort or convenience of the general public.' " *Id.* at 421.

After concluding that both public nuisance actions and actions in debt were analogous to the statutory action, the Court commented that the first part of the inquiry—whether the statutory action had an 18th century analog—was not as important as the second inquiry—the nature of the relief sought. *Id.* The Court characterized the first inquiry as an " 'abstruse historical' search for the nearest 18th-century analog[,]" *id.* (quoting *Ross v. Bernhard,* 396 U.S. 531, 538 n.10 (1970)), and reiterated its view "that characterizing the relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action in determining whether the Seventh Amendment guarantees a jury trial." *Id.* (quoting *Curtis v. Loether,* 415 U.S. 189, 196 (1974)). The Court then concluded that the nature of the primary remedy sought, civil penalties, was an action at law. *Id.* at 422, 424. Therefore, the defendant had "a constitutional right to a jury trial to determine his liability on the legal claims." *Id.* at 425.

immediate, and not merely speculative or remote.[29] The existence of a criminal counterpart for the claim may prove helpful in the analysis by demonstrating the seriousness of the claim as determined by the legislature.

¶ 115. In its first claim, the State alleged that ECI violated Wis. Admin. Code § NR 211.10(1) (Oct., 2002) every time it caused the City to exceed the discharge standards under its permit. ECI allegedly discharged surfactant-laden wastewater into the City's treatment system, which destroyed the microbes required to properly treat the City's wastewater and resulted in an upset at the City's wastewater treatment plant. This, in turn, caused or significantly contributed to the City's violations of its permit limits for oxygen-consuming organic waste.

¶ 116. There is similarity in this claim to the common law public nuisance claim in *People v. Corporation of Albany,* 11 Wend. 539 (N.Y. 1834). In *Corporation of Albany,* the corporation of the city of Albany was charged by indictment and found guilty by a jury of:

> permitting . . . the basin in the Hudson river, at the termination of the Erie Canal, to be foul, filled and choked up with mud, rubbish, and dead carcas[s]es of animals; whereby the citizens were not only deprived of the benefit and advantage of using the water for the convenience of themselves and families, but the mud . . . became offensive and nauseous, corrupting the water, and causing noisome and unwholesome smells,

---

[29] The State made 15 claims in its complaint, sometimes alleging violations of differing statutes and administrative code provisions within each claim. It is logical then to apply the *Village Food* test to each claim rather than to each individual statute and administrative code provision.

infecting the air to the damage and common nuisance of the citizens residing in the vicinity and those passing and re-passing the basin.

*Id.*

¶ 117. The decision speaks of the water being "corrupted" and that the water became "unfit for drinking or culinary purposes." The court said a "common nuisance . . . seems to be an offense against the public." *Id.* at 543.

¶ 118. A more vivid case of discharging wastewater came out of Indiana:

> [Taylor] was charged with urinating in a spring of water near a public highway, out of which many persons in the vicinity, and travelers along the road, were accustomed to use water, thereby rendering the spring unfit for use . . . to the obstruction of the free use of the water thereof by the citizens of the State. The information was quashed on the ground that it did not charge a public offense.

*State v. Taylor,* 29 Ind. 517, 517 (May Term, 1868). The Indiana Supreme Court reversed, saying:

> Our statute, perhaps, gives as accurate a definition of the term nuisance, as understood at common law, as can be found elsewhere: "Whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property. If the injury were limited to an individual, it gave a private right of action; if it affected the public, it was the subject of a public prosecution. That the present information is within the common law definition is, we think, recognized in *Sloan v. The State,* 8 Ind. 312. The motion to quash should have been overruled.

*Id.*

412

¶ 119.   In a Wisconsin case, *Luning v. State,* 2 Pin. 215 (Wis. 1849), the party was indicted and found guilty by a jury "for erecting and maintaining a mill-dam, which caused the water to overflow a large tract of heavily timbered land . . . and which was alleged created unpleasant and unwholesome vapors and sickness to the inhabitants of that village." *Luning,* 2 Pin. at 218–19. At trial, witnesses testified that "an offensive effluvia was produced by the spreading of the water over a much larger tract of land than was covered by the stream in its natural state." *Id.* at 216. The court discussed the effects created by the dam as the public nuisance. *Id.* at 220.

¶ 120.   The allegations in claim 1 are of similar nature. Like the corporation in *Corporation of Albany,* ECI allegedly discharged wastewater into the City's treatment plant that, in essence, "fouled, filled, and choked up" the City's wastewater treatment plant with surfactant-laden wastewater that destroyed valuable microbes. Although the State in claim 1 did not allege harm that caused sickness to inhabitants, it did allege that discharged water caused upsets at the City's treatment plant. This allegation of direct harm is sufficient to analogize this claim to the common law of nuisance. Furthermore, the legislature has reinforced the serious nature of this claim by providing the option for criminal prosecution of violations alleged in this claim. *See* Wis. Stat. § 283.91(3).

¶ 121.   Claims 4, 5, and 7 are also similar to the public nuisance claims in *Corporation of Albany, Luning,* and *Taylor* because they involve allegations of illegal discharge of wastewater, which results in unauthorized *pollution* of the City's sewer system. Again, although the State does not allege harm of the same magnitude required at common law, the State does

413

allege direct harm in the form of unauthorized pollution of the City's sewer system. Claims 4 and 5 involve violations of either Wis. Admin. Code chs. NR 211 or 261, both of which are promulgated under Wis. Stat. ch. 283. Wisconsin Stat. ch. 283 allows for criminal prosecution of violations alleged under the chapter or rules promulgated under the chapter. Wis. Stat. § 283.91(1), (2), and (3). Thus, the legislature has reinforced the serious nature of these claims and the violations alleged in these claims to cause direct, serious harm to the environment.[30]

¶ 122. In claim 4 the State alleged that ECI exceeded its discharge limits of concentrations of certain pollutants. Specifically, the State alleged that ECI violated the oil and grease, copper, zinc, lead, and cyanide limits, meaning that ECI discharged these pollutants into the sewer system. The exceedance of discharge limits is a direct harm to the City's sewer system and was likely to cause further harm, such as an upset described in claim 1.

¶ 123. In claim 5 the State alleged that ECI failed to notify the City of any substantial change in the character of the pollutants in its discharge, namely high concentrations of phosphorous, oxygen consuming organic waste, surfactant-laden waste, and wastes with high concentrations of metals. To prevail on this claim, the State was required to prove that ECI's discharges contained these unauthorized pollutants. Failure to notify the City of a substantial change in the character

---

[30] Claim 7 involves violations of ECI's permit that subjected ECI to liability under Wis. Stat. ch. 281. Wisconsin Stat. § 281.98 does not provide the option for criminal prosecution. However, claim 7, as pled, alleges some direct and immediate harm. Therefore, because claim 7 satisfies the test in *Village Food,* ECI was entitled to receive a jury trial on claim 7.

of the pollutants in its discharge reflected a direct harm to the City's sewer system in the form of unauthorized pollution.

¶ 124.   In claim 7 the State alleged that ECI failed to comply with approved plans by discharging water without adequately treating it, operating without a flow meter or sampler, discharging wastewater without passing through the flow meter, discharging wastes and sludge through the truck bay manhole, accepting unauthorized wastes, and following improper waste acceptance procedures. This broad claim also included allegations of direct harm in the form of unauthorized pollution. For example, discharging waste without adequately treating it and discharging wastes and sludge through the truck bay manhole involved direct pollution of the City's sewer system.

¶ 125.   All three claims involved unlawful discharge of wastewater and therefore alleged direct harm of pollution to public resources. This is the essence of public nuisance.

¶ 126.   Claim 12 is also similar to the common law of public nuisance. Claim 12 dealt with the improper disposal of hazardous waste. In claim 12 the State alleged that ECI disposed of hazardous waste at a non-hazardous, solid waste landfill not authorized to accept such waste. This is analogous to dumping waste.

¶ 127.   This claim is similar to the claim in *State v. Buckman,* 8 N.H. 203 (1836). In *Buckman,* the defendant was indicted for throwing into a well the carcass of an animal which tainted and corrupted the water used by a family. The court held that this act constituted a public nuisance because "water infected with the noisome particles and effluvia of a dead animal thrown into it, must partake of a character so poisonous and unwholesome as properly to come within this class of

offences." *Id.* at 205. The State brought the action notwithstanding the fact that the well appeared to be private rather than public.

¶ 128. Like the dead carcass in *Buckman,* the hazardous waste in this case was inappropriately handled and disposed of at an inappropriate site. The characterization of the waste as hazardous implies that it is also of a character so poisonous and unwholesome as to qualify as a sufficient analogy to the harm in *Buckman.* Hazardous waste is defined as "waste that—because of its quantity, concentration, or physical, chemical, or infectious characteristics—may cause or significantly contribute to an increase in mortality or otherwise harm human health or the environment." Black's Law Dictionary 1584 (7th ed. 1999). By allegedly disposing of this waste at an improper site, ECI caused direct and immediate harm to human health and the environment.

¶ 129. Furthermore, claim 12 involves an alleged violation of Wis. Stat. 291.21(9). The legislature has reinforced the seriousness of this claim by providing the option for criminal prosecution of the violations alleged in this claim. *See* Wis. Stat. § 291.97.

¶ 130. By contrast, although the legislature has provided the option to proceed criminally against violations alleged in claims 3, 8, 9, 10, 11, 13, and 14, these claims are not sufficiently similar to the common law of public nuisance to require a jury trial because they do not involve allegations of direct and immediate harm. Any harm that may result under these claims is remote and speculative.

¶ 131. Claims 3, 8, 11, 13, and 14 involve ECI's improper acceptance or storage of waste, including hazardous waste. These claims attempt to head off the improper disposal of waste by prohibiting the improper

416

acceptance or storage of waste. Hence, the harm to water or land is contingent upon disposal. The harm may be probable, but it is not direct and immediate.

¶ 132. In claim 3 the State alleged that ECI failed to notify the City that it was accepting new types of categorical waste, such as organic chemical wastewater, pharmaceutical wastewater, surfactant-laden wastewater, phosphorus-laden wastewater, unknown wastewater, and septage. The State alleged that ECI's treatment system was not designed to properly treat any of the wastes. In claim 8 the State alleged ECI failed to implement proper waste acceptance procedures and as a result, "improperly accepted wastes [it] was incapable of properly treating, and wastes reasonably expected to cause exceedances of the City's effluent limits." In claim 11 the State alleged that ECI's treatment of certain wastewater generated a hazardous waste and that ECI failed to characterize this waste as hazardous. In claim 13 the State alleged that ECI operated a hazardous waste facility without an operating license. In claim 14 the State alleged that ECI illegally handled hazardous waste by failing to label the tank as containing hazardous waste and by leaving the tank open.

¶ 133. In sum, these claims allege conduct that could lead to harm, as opposed to claims 1, 4, 5, 7, and 12 that alleged conduct that did lead to direct and immediate harm in the form of unauthorized pollution.

¶ 134. Claims 9 and 10 are also not similar to a public nuisance. These claims involve purely regulatory administrative provisions in the sense that they allege only a failure to sample discharge or to submit paperwork. Purely regulatory requirements such as sampling discharge or submitting semi-annual reports are not the type of actions that would have been recognized as

417

a public nuisance in 1848. Harm resulting from failure to sample discharge or submit paperwork is at best indirect.

¶ 135.  To illustrate, the State alleged in claim 9 that ECI failed to undertake sufficient sampling and analysis of its effluent to assess whether it complied with its permit limits. The complaint alleged that "on at least 260 occasions between July 2001 and August 2002, defendants failed to take representative samples to assess compliance with permit limits." By implication, defendants could have taken representative samples on approximately 150 occasions during this period. The failure to take other samples would not in itself have caused harm to the municipal sewer system. Thus, the State's cause of action does not allege sufficient harm to be analogous to a common law nuisance action. It is a purely regulatory requirement that does not require a trial by jury.

¶ 136.  In claim 10, the State alleged that ECI submitted incomplete semi-annual reports to the City. Specifically, the State alleged that the reports provided sampling results data and flow volumes but failed to contain other required information, such as the name and address of each waste's generator, the volume and date of arrival of each wastewater, and the applicable pretreatment standards. This claim does not warrant a civil jury trial. Whether ECI's failure to submit complete semi-annual reports caused any harm is too speculative.

¶ 137.  Claims 1, 4, 5, 7, and 12 are of similar nature to a public nuisance because they involve allegations of harm that, although not of the same magnitude required at the common law, is direct and immediate, and not speculative or remote. Furthermore, the legislature reinforced the seriousness of the violations

alleged in these claims (except claim 7) by providing the option for criminal prosecution. Claims 3, 8, 9, 10, 11, 13, and 14 are not of similar nature to a public nuisance because, although the legislature has provided the option for criminal prosecution of the violations alleged in these claims, they do not involve allegations of direct and immediate harm.

2.   Second Prong under the *Village Food* Test

¶ 138.   Under the second prong of the *Village Food* test, the court must determine whether a public nuisance action was regarded as at law in 1848. *Village Food,* 254 Wis. 2d 478, ¶ 16.

¶ 139.   Before the adoption of the constitution, "the line between law and equity (and therefore between jury and non-jury trial) was not a fixed and static one. There was a continual process of borrowing by one jurisdiction from the other." Fleming, *supra,* at 658. This borrowing led to a very large overlap between law and equity. *Id.* Therefore, the historical inquiry into the character of the action in 1848 is a complicated one.

¶ 140.   The difference between a court of common law and a court of equity is best summarized "by considering the different natures of the rights they are designed to recognize and protect, the different natures of the remedies which they apply, and the different natures of the forms and modes of proceeding which they adopt." Joseph Story, *Commentaries on Equity Jurisprudence* 19 (Isaac F. Redfield, addt'l author, 9th ed. 1866) (1834)). Historically, courts of equity were able to administer remedies for rights that "courts of common law d[id] not recognize at all; or, if they d[id] recognize them, they le[ft] them wholly to the conscience and good-will of the parties." *Id.* at 21. In

addition, the remedies in courts of equity were often very different from the remedies in courts of common law. *Id.* Courts of equity interfered by way of injunction to prevent wrongs; whereas, courts of common law were generally able to award only damages after the wrong was done. *Id.* at 21–22. In cases of nuisance, courts of common law were also able to invoke the legal remedy of abatement. 3 Blackstone, *supra,* at 222.[31] Lastly, "[t]he modes of seeking and granting relief in equity [we]re also different from those of courts of common law. The latter proceed[ed] to the trial of contested facts by means of a jury[,] ... [whereas] courts of equity tr[ied] causes without a jury." Story, *supra,* at 22.

¶ 141.  The State argues that public nuisance actions were actions only in equity in 1848. The State cites numerous cases for this proposition, such as

---

[31] The old common law remedies by action for abatement of a nuisance by a private plaintiff were two: (1) an assize of nuisance, which was a criminal writ in which the sheriff was commanded to summon an assize (a jury) and view the premises, and if the jury found for the plaintiff, the plaintiff would have judgment to have the nuisance abated and judgment for damages; (2) a writ of quod permittat prosternere, which commanded the defendant to permit the plaintiff to abate the nuisance, or to show cause why the defendant will not; if successful, the plaintiff could have judgment to abate the nuisance and to recover damages against the defendant. 3 Blackstone, *supra,* at 221–22.

For cases in which the State had a public nuisance abated, see *Douglass v. State,* 4 Wis. 403 [*387] (1854), and *Stoughton v. State,* 5 Wis. 291 (1856).

For a discussion of nuisance abatement as legal or equitable, see James Williamson, *Remedies—Nuisance Abatement as Legal or Equitable,* 39 Marq. L. Rev. 163 (1955–56). *See also* C.C. Langdell, *A Brief Survey of Equity Jurisdiction,* 1 Harv. L. Rev. 111 (1887–88).

*Kamke v. Clark,* 268 Wis. 465, 478c, 67 N.W.2d 841 (1955), which stated that "[i]njunctions to prevent nuisances have always been rendered in courts of chancery and not by courts of law."

¶ 142.   The State's arguments do not answer ECI's arguments that public nuisance actions were considered criminal actions (actions at law) long before 1848 and before the equitable remedy of injunction. Case law and other historical sources support ECI's arguments. To illustrate, Blackstone stated that "no *action* lies for a public or common nuisance, but an *indictment* only." 3 Blackstone, *supra,* at 219. Blackstone also wrote that public nuisances are "punishable by public prosecution, and subject to fine according to the quantity of the misdemeanor." 4 Blackstone, *supra,* at 167.

¶ 143.   The Wisconsin Revised Statutes of 1849 also acknowledged criminal jurisdiction for a public nuisance. Wis. Rev. Stat. ch. 26, § 3 (1849). In *Luning,* the plaintiff in error was indicted for a public nuisance and was tried before a jury. In *Douglass v. State,* 4 Wis. 403 [*387] (1854), the defendant was indicted and found guilty by a jury for a public nuisance, and the court ordered the nuisance to be abated. In *Stoughton v. State,* 5 Wis. 291 (1856), the defendant was indicted and found guilty by a jury for a public nuisance, and the court entered a judgment for the abatement of the nuisance and fined the defendant $50.00 and costs.

¶ 144.   In *Attorney General v. Chicago & Northwestern Railway Co.,* 35 Wis. 425 (1874), this court noted that a public nuisance was historically the subject of criminal jurisdiction and was a proceeding at law. The court noted the following:

> A public nuisance being the subject of criminal jurisdiction, the ordinary and regular proceeding at law is

421

by indictment or information, by which the nuisance may be abated, and the person who caused it may be punished. . . . Besides this remedy at law, it is now settled that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general. This jurisdiction seems to have been acted on with great caution and hesitancy.

*Id.* at 538 (quoting *Georgetown v. Alexandria Canal Co.,* 37 U.S. 91, 97–98 (1838)).

¶ 145. Traditionally, "[c]ourts of equity ha[d] no jurisdiction over criminal proceedings, except that under certain circumstances, they w[ould] restrain a public nuisance." James P. Holcombe, *An Introduction to Equity Jurisprudence* 13 (1846). Courts of equity would interfere, however, only when the court of common law would not afford an adequate and sufficient remedy. Denis G. Lubé, *Equity Pleadings* 6 (1846).[32]

¶ 146. This authority supports a holding that a public nuisance action was generally an action at law in 1848 and was sometimes an action in equity when a party sought injunctive relief. I therefore analyze the relief sought in this case to determine whether it would have been an action at law or an action in equity. *See Village Food,* 254 Wis. 2d 478, ¶ 33 (concluding that

---

[32] *See* Prosser, *supra* note 20, at 604. It states:

> As to public nuisance, the remedy by injunction may exist in favor of the state. Its use is somewhat complicated by the traditional rule that equity will not enjoin a crime as such, where the effect will be to deprive the defendant of his constitutional safeguards; but this will not prevent the injunction where the criminal penalty is inadequate to prevent the damage threatened by the continuation of the nuisance, and it has been held that there is no double jeopardy in such a remedy.

(footnotes omitted).

action was legal in nature in 1848 after analyzing nature of relief sought by plaintiffs).

¶ 147.   In this case, the State did not proceed criminally against ECI, although it might have done so under Wis. Stat. § 283.91 and potentially under Wis. Stat. § 291.97.[33] The State proceeded civilly and sought forfeitures. "A statutory . . . forfeiture proceeding is usually an action by a governmental unit for the recovery of a money penalty." *County of Columbia v. Bylewski,* 94 Wis. 2d 153, 161–62, 288 N.W.2d 129 (1980). Such a proceeding smacks of a remedy at law. *See id.; Tull v. United States,* 481 U.S. 412, 422 (1987) (stating, "A civil penalty was a type of remedy at common law that could only be enforced in courts of law."). While the State's complaint also asked for "appropriate injunctional relief," this prayer for relief was only incidental to its prayer for monetary compensation and therefore did not change the nature of relief sought.[34] *See Tull,* 481 U.S. at 424. It is important to note that ECI's facility was closed for more than a year before the State sued.

¶ 148.   Finally, although the action in this case is civil, not criminal, that distinction is not dispositive. "The fact that one is undertaken in the civil context, rather than the criminal context, should not deprive the parties of a jury trial in this instance." *Village Food,* 254 Wis. 2d 478, ¶ 29.

¶ 149.   In short, a public nuisance action involving the type of forfeitures sought in this case was an action at law in 1848.

---

[33] Wisconsin Stat. § 291.97(2) requires willful conduct for the State to prosecute criminally.

[34] In this case, the court ordered forfeitures of $219,120 and ordered no injunctive relief.

¶ 150.   A majority of this court is unable to accept this overall analysis. Instead, it severs the historic connection between public nuisance at common law and modern environmental regulation. Ostensibly, the majority does not preclude the right to a civil jury trial in all environmental regulatory cases, but it provides no guidance to circuit judges on when that might be appropriate. This is a sad day for Wisconsin.

¶ 151.   I concur with the majority's denial of a jury trial on claims 3, 8, 9, 10, 11, 13, and 14. I dissent from the majority's denial of a jury trial on claims 1, 4, 5, 7, and 12.

¶ 152.   I am authorized to state that Justices JON P. WILCOX and PATIENCE DRAKE ROGGENSACK join this concurrence/dissent.